Anne L. Weismann
D.C. Bar No. 298190
Melanie Sloan
D.C. Bar No. 434584
Daniel C. Roth
(MA Bar No. 661021)
(*pro hac vice* motion submitted)
Citizens for Responsibility
and Ethics in Washington
1400 Eye Street, N.W.
Suite 450
Washington, D.C.  20005
202-408-5565

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON 1400 Eye Street, N.W., Suite 450 Washington, D.C. 20005 : : : : : | |
| Plaintiff, : | |
| v.  : | Civil Action No._____ |
| : | |
| COUNCIL ON ENVIRONMENTAL QUALITY 722 Jackson Place, N.W. Washington, D.C. 20503 : : : : : | |
| Defendant. : | |

---

## COMPLAINT FOR DECLARATORY JUDGMENT
## AND INJUNCTIVE RELIEF

1.  This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as

amended, as well as agency FOIA regulations, challenging the failure of the Council on

Environmental Quality ("CEQ"), a component of the Executive Office of the President ("EOP"), to fulfill the request of Citizens for Responsibility and Ethics in Washington ("CREW") for documents relating to global warming or climate change.

2. This case seeks declaratory relief that CEQ is in violation of the FOIA and agency regulations for failing to fulfill CREW's request for records by not producing or otherwise accounting for responsive documents and injunctive relief that CEQ immediately and fully comply with CREW's request for records under the FOIA.

## JURISDICTION AND VENUE

3. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

4. Plaintiff CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to protecting the right of citizens to be informed about the activities of government officials and to ensuring the integrity of government officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. To advance its mission, CREW uses a combination of research, litigation, advocacy, and public education. As part of its research, CREW uses government records made available to it under the FOIA.

5. CREW has invested considerable organizational resources in pushing the U.S. government to take ethical issues seriously. CREW monitors closely the laws and rules applicable to government agencies.

6. CREW is harmed by CEQ's failure to comply with the FOIA because that failure harms CREW's ability to provide full, accurate, and current information to the public on a matter of great public interest and urgency. 5 U.S.C. § 552(a)(6)(c). Absent this critical information, CREW cannot advance its mission of educating the public to ensure that the public continues to have a vital voice in government decisions.

7. CREW will analyze the information it receives that is responsive to its request, and will share it with the public through memoranda, reports or press releases. In addition, CREW will disseminate any documents it acquires from its request to the public through the CREW Document Review System, an interactive website where members of the public can analyze and comment on public documents. See http://foia.citizensforethics.org/home. Currently, CREW's website contains links to thousands of pages of documents acquired from multiple FOIA requests. See, e.g., http://www.citizensforethics.org/activities/campaign.php?view=130. Visitors to CREW's website can peruse the FOIA request letters, responses from government agencies and a growing number of documents responsive to FOIA requests. The CREW website also includes documents relating to CREW's FOIA litigation, Internal Revenue Service complaints and Federal Election Commission complaints.

8. Defendant CEQ is an agency within the meaning of 5 U.S.C. § 552(f). Defendant is the federal agency with possession and control of the requested records and is responsible for fulfilling CREW's FOIA request.

## STATUTORY FRAMEWORK

### The Freedom of Information Act

9.  The FOIA, 5 U.S.C. § 552, requires agencies of the federal government to release requested records to the public unless one or more specific statutory exemptions apply.

10.  An agency must respond to a party making a FOIA request within 20 working days, notifying that party of at least the agency's determination whether or not to fulfill the request, and of the requester's right to appeal the agency's determination to the agency head.  5 U.S.C. § 552(a)(6)(A)(I).  CEQ regulations set a shorter response time, requiring CEQ to respond to FOIA requests within 10 working days of receipt.  40 C.F.R. § 1515.5(b)(4).

11.  An agency must respond to a FOIA appeal within 20 working days, notifying the appealing party of the agency's determination to either release the withheld records or uphold the denial.  5 U.S.C. § 552(a)(6)(A)(ii).

12.  In "unusual circumstances," an agency may delay its response to a FOIA request or appeal, but must provide notice and must also provide "the date on which a determination is expected to be dispatched."  5 U.S.C. § 552(a)(6)(B).

13.  The FOIA also requires each agency to promulgate regulations specifying a fee schedule for the processing of FOIA requests and establishing procedures and guidelines for the waiver or reduction of fees.  5 U.S.C. § 552(a)(4)(A).  Defendant CEQ's fee waiver regulations are found at 4 C.F.R. §1515.15, and do not establish any procedures for waiving or reducing fees. Under the FOIA, agencies should produce documents at no charge to the requester or at a reduced charge if "disclosure of the information is in the public interest because it is likely to contribute

significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester," 5 U.S.C. §552(a)(4)(A)(iii).

14.  This Court has jurisdiction, upon receipt of a complaint, "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).

15.  The FOIA provides a mechanism for disciplinary action against agency officials who have acted inappropriately in withholding records. Specifically, when requiring the release of improperly withheld records, if the Court makes a written finding that "the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously," a disciplinary investigation is triggered. 5 U.S.C. § 552(a)(4)(F).

## FACTS GIVING RISE TO PLAINTIFF'S CLAIMS FOR RELIEF

16.  The U.S. Congress created the Council for Environmental Quality through the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et. seq. As part of its mission, CEQ must "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b). CEQ regulations also require that "[t]he information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." Id.

17.  Currently, there is a scientific consensus that the earth is warming at a potentially dangerous rate, with human activity contributing to that process of global warming. See, e.g., Climate Change 2007: The Physical Science Basis, Summary for Policy Makers, United Nations Intergovernmental Panel on Climate Change (Feb. 2007) (attached as Exhibit 1); Elizabeth Rosenthal & Andrew C. Revkin, Science Panel Calls Global Warming "Unequivocal", N.Y.

Times, Feb. 3, 2007 (attached as Exhibit 2); Juliet Eilperin, <u>Debate on Climate Shifts to Issue of</u>

<u>Irreparable Change; Some Experts on Global Warming Foresee 'Tipping Point' When It Is Too</u>

<u>Late to Act</u>, Wash. Post, Jan. 29, 2006 (attached as Exhibit 3).  Although recent pronouncements

by the scientific community convey a higher degree of certainty about the causes of this warming

than ever before, scientists worldwide have expressed grave concerns about the dangers of

warming and its human causes since at least 2001, the year President Bush took office.  <u>See</u>

<u>Climate Change 2001: Synthesis Report</u>, Intergovernmental Panel on Climate Change (2001),

<u>available</u> <u>at</u> http://www.grida.no/climate/ipcc_tar/vol4/english/index.htm (last visited Feb. 13,

2007).  <u>See</u> <u>also</u> Naomi Oreskes, <u>Beyond the Ivory Tower: The Scientific Consensus on Climate</u>

<u>Change</u>, Science, Dec. 3, 2004 (attached as Exhibit 4) (analyzing 928 scientific reports on climate

change published between 1993 and 2003).

    18.  U.S. government scientists at CEQ and other agencies have been studying the issue of

global warming for many years, and have produced a variety of reports to inform the public and

Congress on the issue.  See, e.g., <u>Our Changing Planet; The U.S. Climate Change Science</u>

<u>Program for Fiscal Years 2004 and 2005</u>, <u>available</u> <u>at</u>

http://www.usgcrp.gov/usgcrp/Library/ocp2004-5/default.htm (last visited Feb. 13, 2007).

Notwithstanding CEQ's mandate to present the best scientific information to the public, in recent

years political appointees at CEQ have edited many of these reports in ways that distorted

scientific conclusions and deprived Congress and the American public of the government's

scientific conclusions, warnings, and predictions on climate change.  <u>See</u> Andrew C. Revkin,

<u>Bush Aide Edited Climate Reports</u>, N.Y. Times, June 8, 2005 (attached as Exhibit 5); <u>Rewriting</u>

<u>The Science</u>, *60 Minutes* (CBS television broadcast, first aired March 19, 2006) (print version

6

July 30, 2006) ("Rewriting the Science") (attached as Exhibit 6); Memorandum from Chairman

Henry A. Waxman to Members of the Committee on Oversight and Government Reform, re: CEQ

Documents (Jan. 30, 2007) at 5 [hereinafter "Cmte. Mem."] (attached as Exhibit 7).

19.  For example, former CEQ Chief of Staff Philip A. Cooney, a former lobbyist and

"climate team leader" for the leading oil industry trade group, the American Petroleum Institute,

edited drafts of an annual climate change report entitled "Our Changing Planet" by inserting and

enhancing ambiguities about climate change.  Revkin, N.Y. Times, June 8, 2005; Rewriting The

Science.  Rick Piltz, who for ten years co-wrote and edited reports, including "Our Changing

Planet" for the Climate Change Science Program ("CCSP") that CEQ oversees, has described Mr.

Cooney's editing role as including instances where "a line that said earth is undergoing change

becomes 'may be undergoing change' . . . One line that says energy production contributes to

warming was just crossed out."  Rewriting The Science.  Mr. Cooney is a lawyer with a

background in economics, not a scientist.  Revkin, N.Y. Times, June 8, 2005.

20.  On July 29, 2006, the bipartisan leadership of the House Committee on Government

Reform (now the House Committee on Oversight and Government Reform) ("the Committee")

sent a letter to CEQ Chairman James Connaughton requesting that CEQ produce by August 11,

2006, all documents and communications relating to:  (1) Mr. Cooney's climate-change related

activities; (2) CEQ's review and edits of climate-change materials produced by other federal

agencies; (3) CEQ efforts to manage or influence the statements of governmental scientists or

experts to the media; (4) communications between CEQ and other federal agencies regarding

climate change; and (5) contacts between CEQ and non-governmental parties on climate change.

Letter from Tom Davis, Chairman, and Henry A. Waxman, Ranking Minority Member, U.S.

7

House of Representatives Committee on Government Reform, to James Connaughton, Chairman, CEQ (July 20, 2006) at 1 (attached as Exhibit 8).

21. Following discussions with CEQ staff, the Committee broadened its request to include the files of other CEQ staff. See Letter from Henry A. Waxman, Chairman, and Tom Davis, Ranking Minority Member, U.S. House of Representatives Committee on Oversight and Government Reform, to James Connaughton, Chairman, CEQ (Jan. 22, 2007) (attached as Exhibit 9). The Committee also requested that CEQ produce 39 specific documents, with no redactions, by January 25, 2007, and that CEQ produce all other documents responsive to the Committee's requests by February 9, 2007. Id.

22. CEQ did not produce the requested documents by January 25 and, instead, provided the Committee with nine of the 39 requested documents on January 29, 2007. Letter from Henry A. Waxman, Chairman, and Tom Davis, Ranking Minority Member, U.S. House of Representatives Committee on Oversight and Government Reform, to James Connaughton, Chairman, CEQ (Jan. 30, 2007) (attached as Exhibit 10). Those nine documents are the only non-public documents CEQ has provided to date to the Committee. Id

### Plaintiff's FOIA Request and Follow-Up

23. By letter dated May 12, 2006, pursuant to the FOIA, CREW requested that CEQ provide all records

> that mention or relate to the causes associated with the increase in the average temperature of the earth's atmosphere and oceans that has been observed in recent decades ("climate change" or "global warming"), including, but not limited to, all records relating to scientific and policy reports.

Letter from Tim Mooney, Senior Counsel, Citizens for Responsibility and Ethics in Washington, to Khary Cauthen, Chief of Staff, Council on Environmental Quality (May 12, 2006) (attached as Exhibit 11). CREW noted its particular interest in communications between CEQ and the president, vice president, federal agency officials, members of Congress, and energy and extractive industries concerning global warming. Id. CREW also sought all CEQ records from 2001 to the present relating to the drafting and review of all reports by the CCSP. Id.

24. In addition, CREW sought a waiver of all fees associated with processing its request. As CREW explained, the subject of its request "is of particular interest and importance to the public in light of the revelations that CEQ officials edited conclusions made by government climate experts based on political expediency rather than sound science." Id. Disclosure of the requested records is likely to contribute to the public's understanding of the manner and extent to which outside forces may have affected and overridden the scientific judgments of the CCSP. Id.

25. At CEQ's request, CREW worked with the agency to narrow its FOIA request, even though CREW made clear that its original request as formulated was sufficiently clear and narrow to warrant a fee waiver. Toward that end, CREW clarified that it was not seeking publicly available documents, such as unannotated newspaper clips, or documents that only pertain to activities of junior CEQ staff, and clarified that it was seeking documents from January 20, 2001, to October 26, 2006. CEQ, in turn, agreed to produce a Vaughn index identifying, document-by-document, all documents it was withholding, to begin producing documents during the week of October 30, 2006, and to produce documents and the corresponding Vaughn indices thereafter on a rolling basis.

26. Pursuant to this agreement, CEQ produced to CREW 188 documents on November 3, 2006, consisting primarily of public climate change reports and essays, as well as correspondence from industry leaders interested in participating in various environmental initiatives. CEQ did not make any redactions to the documents. CEQ also acknowledged that because it was processing CREW's request in connection with the requests of the Committee and other FOIA requesters, "some documents provided may not be directly responsive to your request." Letter from Edward A. Boling, Deputy General Counsel, CEQ, to Dan Roth, Counsel, CREW (Nov. 3, 2006) at 1 (attached as Exhibit 12).

27. On December 26, 2006, CEQ sent CREW an additional 103 documents without redactions that included copies of non-governmental climate change reports, newspaper clippings and correspondence concerning the Bush administration's position on the Kyoto Treaty, and emails from 2001 through the first half of 2002 consisting almost exclusively of outside reports and newspaper clips that had been emailed around CEQ and other White House offices.

28. On January 30, 2007, following a Committee hearing, CEQ provided CREW with a letter dated January 29, 2007, from CEQ Chairman James Connaughton to the Committee, along with nine documents that CEQ had submitted to the Committee with its letter.

29. All of the documents that the Committee has requested of CEQ are also within the scope of CREW's FOIA request of CEQ. Since October 20, 2006, CEQ has made additional documents available to the Committee beyond the nine it produced on January 30, 2007, including hand-written notes by Mr. Cooney. See Cmte. Mem. at 5. CEQ has yet to produce these documents to CREW or claim an exemption for them under the FOIA. These documents "appear

to contain evidence of a vigorous effort by senior Administration officials to downplay the certainty and negative impacts of global warming." Id. at 3.

30. On several occasions between January 30 and February 12, 2007, CEQ represented that it would produce to CREW all non-deliberative materials that CEQ was to produce to the Committee on February 9, and would attempt to produce a Vaughn index accounting for any withholdings or redactions. As of January 13, 2007, CREW has received neither the documents nor a Vaughn index.

31. To date, CEQ has not produced to CREW a single document containing any redaction or claimed that any document, or portion thereof, is exempt under the FOIA.

32. CREW has now constructively exhausted its administrative remedies with respect to the processing of CREW's FOIA request. See, e.g., Judicial Watch v. Rossoti, 326 F.3d 1309, 1310 (D.C. Cir. 2003) citing 5 U.S.C. § 552(a)(6)(C).

### PLAINTIFF'S CLAIM FOR RELIEF

### CLAIM ONE
**(Failure to Produce Records Under the FOIA)**

33. Plaintiff realleges and incorporates by reference all preceding paragraphs.

34. Plaintiff properly asked for records within CEQ's control.

35. Plaintiff is entitled by law to access to the records requested under the FOIA, unless defendant makes an explicit and justified statutory exemption claim.

36. Therefore, CEQ violated FOIA's mandate to release agency records to the public by failing to release the records as plaintiff specifically requested. 5 U.S.C. §§ 552(a)(3)(A), 552(a)(4)(B).

## CLAIM TWO
### (Failure to Respond Under the FOIA)

37. Plaintiff realleges and incorporates by reference all preceding paragraphs.

38. To date, plaintiff has not received a full response from CEQ and CEQ has exceeded the 20-working-day statutory time limit for such a response. 5 U.S.C. §5 52(a)(6)(A)(I).

39. Therefore, CEQ has violated the FOIA's mandate to respond to plaintiff's FOIA request within the statutory time period.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

(1) Declare that CEQ has violated the Freedom of Information Act by failing to lawfully satisfy plaintiff's FOIA request of May 12, 2006;

(2) Order CEQ to release immediately all records responsive to plaintiff's FOIA request;

(3) Award plaintiff its reasonable attorney fees and litigation costs in this action, pursuant to 5 U.S.C. § 552(a)(4)(E); and

(4) Grant such other and further relief as the Court may deem just and proper.


Respectfully submitted,


Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Daniel C. Roth

12

(MA Bar No. 661021)
Citizens for Responsibility and
  Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone: (202) 408-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

Dated:  February 20, 2007

**EXHIBIT 1**

 

# INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE

# Climate Change 2007: The Physical Science Basis

# Summary for Policymakers

### Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change

> **This Summary for Policymakers was formally approved at the 10th Session of Working Group I of the IPCC, Paris, February 2007.**
>
> **Note:**
> **Text, tables and figures given here are final but subject to copy-editing.**
>
> **Corrections made as of February 5th, 2007**

**Drafting Authors:**
Richard Alley, Terje Berntsen, Nathaniel L. Bindoff, Zhenlin Chen, Amnat Chidthaisong, Pierre Friedlingstein, Jonathan Gregory, Gabriele Hegerl, Martin Heimann, Bruce Hewitson, Brian Hoskins, Fortunat Joos, Jean Jouzel, Vladimir Kattsov, Ulrike Lohmann, Martin Manning, Taroh Matsuno, Mario Molina, Neville Nicholls, Jonathan Overpeck, Dahe Qin, Graciela Raga, Venkatachalam Ramaswamy, Jiawen Ren, Matilde Rusticucci, Susan Solomon, Richard Somerville, Thomas F. Stocker, Peter Stott, Ronald J. Stouffer, Penny Whetton, Richard A. Wood, David Wratt

**Draft Contributing Authors:**
Julie Arblaster, Guy Brasseur, Jens Hesselbjerg Christensen, Kenneth Denman, David W. Fahey, Piers Forster, Eystein Jansen, Philip D. Jones, Reto Knutti, Hervé Le Treut, Peter Lemke, Gerald Meehl, Philip Mote, David Randall, Dáithí A. Stone, Kevin E. Trenberth, Jürgen Willebrand, Francis Zwiers

**IPCC Secretariat,  c/o WMO,  7bis, Avenue de la Paix,  C.P. N° 2300,  1211 Geneva 2,  SWITZERLAND**
Phone: +41 22 730 8208/8254/8284    Fax: +41 22 730 8025/8013
E-mail: IPCC-Sec@wmo.int    Website: http://www.ipcc.ch

## INTRODUCTION

The Working Group I contribution to the IPCC Fourth Assessment Report describes progress in understanding of the human and natural drivers of climate change[1], observed climate change, climate processes and attribution, and estimates of projected future climate change. It builds upon past IPCC assessments and incorporates new findings from the past six years of research. Scientific progress since the TAR is based upon large amounts of new and more comprehensive data, more sophisticated analyses of data, improvements in understanding of processes and their simulation in models, and more extensive exploration of uncertainty ranges.

The basis for substantive paragraphs in this Summary for Policymakers can be found in the chapter sections specified in curly brackets.

## HUMAN AND NATURAL DRIVERS OF CLIMATE CHANGE

Changes in the atmospheric abundance of greenhouse gases and aerosols, in solar radiation and in land surface properties alter the energy balance of the climate system. These changes are expressed in terms of radiative forcing[2], which is used to compare how a range of human and natural factors drive warming or cooling influences on global climate. Since the Third Assessment Report (TAR), new observations and related modelling of greenhouse gases, solar activity, land surface properties and some aspects of aerosols have led to improvements in the quantitative estimates of radiative forcing.

**Global atmospheric concentrations of carbon dioxide, methane and nitrous oxide have increased markedly as a result of human activities since 1750 and now far exceed pre-industrial values determined from ice cores spanning many thousands of years (see Figure SPM-1). The global increases in carbon dioxide concentration are due primarily to fossil fuel use and land-use change, while those of methane and nitrous oxide are primarily due to agriculture. {2.3, 6.4, 7.3}**

- Carbon dioxide is the most important anthropogenic greenhouse gas (see Figure SPM-2). The global atmospheric concentration of carbon dioxide has increased from a pre-industrial value of about 280 ppm to 379 ppm[3] in 2005. The atmospheric concentration of carbon dioxide in 2005 exceeds by far the natural range over the last 650,000 years (180 to 300 ppm) as determined from ice cores. The annual carbon dioxide concentration growth-rate was larger during the last 10 years (1995 – 2005 average: 1.9 ppm per year), than it has been since the beginning of continuous direct atmospheric measurements (1960 – 2005 average: 1.4 ppm per year) although there is year-to-year variability in growth rates. {2.3, 7.3}

- The primary source of the increased atmospheric concentration of carbon dioxide since the pre-industrial period results from fossil fuel use, with land use change providing another significant but smaller contribution. Annual fossil carbon dioxide emissions[4] increased from an average of 6.4 [6.0 to 6.8][5] GtC

---

[1] *Climate change* in IPCC usage refers to any change in climate over time, whether due to natural variability or as a result of human activity. This usage differs from that in the Framework Convention on Climate Change, where climate change refers to a change of climate that is attributed directly or indirectly to human activity that alters the composition of the global atmosphere and that is in addition to natural climate variability observed over comparable time periods.

[2] *Radiative forcing* is a measure of the influence that a factor has in altering the balance of incoming and outgoing energy in the Earth-atmosphere system and is an index of the importance of the factor as a potential climate change mechanism. Positive forcing tends to warm the surface while negative forcing tends to cool it. In this report radiative forcing values are for 2005 relative to pre-industrial conditions defined at 1750 and are expressed in watts per square metre (W m$^{-2}$). See Glossary and Section 2.2 for further details.

[3] ppm (parts per million) or ppb (parts per billion, 1 billion = 1,000 million) is the ratio of the number of greenhouse gas molecules to the total number of molecules of dry air. For example: 300 ppm means 300 molecules of a greenhouse gas per million molecules of dry air.

[4] Fossil carbon dioxide emissions include those from the production, distribution and consumption of fossil fuels and as a by-product from cement production. An emission of 1 GtC corresponds to 3.67 GtCO$_2$.

[5] In general, uncertainty ranges for results given in this Summary for Policymakers are 90% uncertainty intervals unless stated otherwise, i.e., there is an estimated 5% likelihood that the value could be above the range given in square brackets and 5% likelihood that the value could be below that range. Best estimates are given where available. Assessed uncertainty intervals are not always symmetric about the corresponding best estimate. Note that a number of uncertainty ranges in the Working Group I TAR corresponded to 2-sigma (95%), often using expert judgement.

(23.5 [22.0 to 25.0] GtCO₂) per year in the 1990s, to 7.2 [6.9 to 7.5] GtC (26.4 [25.3 to 27.5] GtCO₂) per year in 2000–2005 (2004 and 2005 data are interim estimates). Carbon dioxide emissions associated with land-use change are estimated to be 1.6 [0.5 to 2.7] GtC (5.9 [1.8 to 9.9] GtCO₂) per year over the 1990s, although these estimates have a large uncertainty. {7.3}

## Changes in Greenhouse Gases
## from ice-Core and Modern Data



**FIGURE SPM-1.** Atmospheric concentrations of carbon dioxide, methane and nitrous oxide over the last 10,000 years (large panels) and since 1750 (inset panels). Measurements are shown from ice cores (symbols with different colours for different studies) and atmospheric samples (red lines). The corresponding radiative forcings are shown on the right hand axes of the large panels. {Figure 6.4}

- The global atmospheric concentration of methane has increased from a pre-industrial value of about 715 ppb to 1732 ppb in the early 1990s, and is 1774 ppb in 2005. The atmospheric concentration of methane in 2005 exceeds by far the natural range of the last 650,000 years (320 to 790 ppb) as determined from ice cores. Growth rates have declined since the early 1990s, consistent with total emissions (sum of anthropogenic and natural sources) being nearly constant during this period. It is *very likely*[6] that the observed increase in methane concentration is due to anthropogenic activities, predominantly agriculture and fossil fuel use, but relative contributions from different source types are not well determined. {2.3, 7.4}

- The global atmospheric nitrous oxide concentration increased from a pre-industrial value of about 270 ppb to 319 ppb in 2005. The growth rate has been approximately constant since 1980. More than a third of all nitrous oxide emissions are anthropogenic and are primarily due to agriculture. {2.3, 7.4}



**FIGURE SPM-2.** Global-average radiative forcing (RF) estimates and ranges in 2005 for anthropogenic carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$) and other important agents and mechanisms, together with the typical geographical extent (spatial scale) of the forcing and the assessed level of scientific understanding (LOSU). The net anthropogenic radiative forcing and its range are also shown. These require summing asymmetric uncertainty estimates from the component terms, and cannot be obtained by simple addition. Additional forcing factors not included here are considered to have a very low LOSU. Volcanic aerosols contribute an additional natural forcing but are not included in this figure due to their episodic nature. Range for linear contrails does not include other possible effects of aviation on cloudiness. {2.9, Figure 2.20}

---

[6] In this Summary for Policymakers, the following terms have been used to indicate the assessed likelihood, using expert judgement, of an outcome or a result: *Virtually certain* > 99% probability of occurrence, *Extremely likely* > 95%, *Very likely* > 90%, *Likely* > 66%, *More likely than not* > 50%, *Unlikely* < 33%, *Very unlikely* < 10%, *Extremely unlikely* < 5%. (See Box TS.1.1 for more details).

**The understanding of anthropogenic warming and cooling influences on climate has improved since the Third Assessment Report (TAR), leading to *very high confidence*[7] that the globally averaged net effect of human activities since 1750 has been one of warming, with a radiative forcing of +1.6 [+0.6 to +2.4] W m$^{-2}$. (see Figure SPM-2). {2.3. 6.5, 2.9}**

- The combined radiative forcing due to increases in carbon dioxide, methane, and nitrous oxide is +2.30 [+2.07 to +2.53] W m$^{-2}$, and its rate of increase during the industrial era is *very likely* to have been unprecedented in more than 10,000 years (see Figures SPM-1 and SPM-2). The carbon dioxide radiative forcing increased by 20% from 1995 to 2005, the largest change for any decade in at least the last 200 years. {2.3, 6.4}

- Anthropogenic contributions to aerosols (primarily sulphate, organic carbon, black carbon, nitrate and dust) together produce a cooling effect, with a total direct radiative forcing of -0.5 [-0.9 to -0.1] W m$^{-2}$ and an indirect cloud albedo forcing of -0.7 [-1.8 to -0.3] W m$^{-2}$. These forcings are now better understood than at the time of the TAR due to improved *in situ*, satellite and ground-based measurements and more comprehensive modelling, but remain the dominant uncertainty in radiative forcing. Aerosols also influence cloud lifetime and precipitation. {2.4, 2.9, 7.5}

- Significant anthropogenic contributions to radiative forcing come from several other sources. Tropospheric ozone changes due to emissions of ozone-forming chemicals (nitrogen oxides, carbon monoxide, and hydrocarbons) contribute +0.35 [+0.25 to +0.65] W m$^{-2}$. The direct radiative forcing due to changes in halocarbons[8] is +0.34 [+0.31 to +0.37] W m$^{-2}$. Changes in surface albedo, due to land-cover changes and deposition of black carbon aerosols on snow, exert respective forcings of -0.2 [-0.4 to 0.0] and +0.1 [0.0 to +0.2] W m$^{-2}$. Additional terms smaller than ±0.1 W m$^{-2}$ are shown in Figure SPM-2. {2.3, 2.5, 7.2}

- Changes in solar irradiance since 1750 are estimated to cause a radiative forcing of +0.12 [+0.06 to +0.30] W m$^{-2}$, which is less than half the estimate given in the TAR. {2.7}

## DIRECT OBSERVATIONS OF RECENT CLIMATE CHANGE

Since the TAR, progress in understanding how climate is changing in space and in time has been gained through improvements and extensions of numerous datasets and data analyses, broader geographical coverage, better understanding of uncertainties, and a wider variety of measurements. Increasingly comprehensive observations are available for glaciers and snow cover since the 1960s, and for sea level and ice sheets since about the past decade. However, data coverage remains limited in some regions.

**Warming of the climate system is unequivocal, as is now evident from observations of increases in global average air and ocean temperatures, widespread melting of snow and ice, and rising global average sea level (see Figure SPM-3). {3.2, 4.2, 5.5}**

- Eleven of the last twelve years (1995 -2006) rank among the 12 warmest years in the instrumental record of global surface temperature[9] (since 1850). The updated 100-year linear trend (1906–2005) of 0.74 [0.56 to 0.92]°C is therefore larger than the corresponding trend for 1901-2000 given in the TAR of 0.6 [0.4 to 0.8]°C. The linear warming trend over the last 50 years (0.13 [0.10 to 0.16]°C per decade) is nearly twice that for the last 100 years. The total temperature increase from 1850 – 1899 to 2001 – 2005 is 0.76 [0.57 to 0.95]°C. Urban heat island effects are real but local, and have a negligible influence (less than 0.006°C per decade over land and zero over the oceans) on these values. {3.2}

---

[7] In this Summary for Policymakers the following levels of confidence have been used to express expert judgments on the correctness of the underlying science: *very high confidence* at least a 9 out of 10 chance of being correct; *high confidence* about an 8 out of 10 chance of being correct. (See Box TS.1.1)

[8] Halocarbon radiative forcing has been recently assessed in detail in IPCC's Special Report on Safeguarding the Ozone Layer and the Global Climate System (2005).

[9] The average of near surface air temperature over land, and sea surface temperature.



**FIGURE SPM-3.** Observed changes in (a) global average surface temperature; (b) global average sea level rise from tide gauge (blue) and satellite (red) data and (c) Northern Hemisphere snow cover for March-April. All changes are relative to corresponding averages for the period 1961-1990. Smoothed curves represent decadal averaged values while circles show yearly values. The shaded areas are the uncertainty intervals estimated from a comprehensive analysis of known uncertainties (a and b) and from the time series (c). {FAQ 3.1, Figure 1, Figure 4.2 and Figure 5.13}

- New analyses of balloon-borne and satellite measurements of lower- and mid-tropospheric temperature show warming rates that are similar to those of the surface temperature record and are consistent within their respective uncertainties, largely reconciling a discrepancy noted in the TAR. {3.2, 3.4}

- The average atmospheric water vapour content has increased since at least the 1980s over land and ocean as well as in the upper troposphere. The increase is broadly consistent with the extra water vapour that warmer air can hold. {3.4}

- Observations since 1961 show that the average temperature of the global ocean has increased to depths of at least 3000 m and that the ocean has been absorbing more than 80% of the heat added to the climate system. Such warming causes seawater to expand, contributing to sea level rise (see Table SPM-1). {5.2, 5.5}

**Table SPM-1.** Observed rate of sea level rise and estimated contributions from different sources. {5.5, Table 5.3}

| | Rate of sea level rise (mm per year) | |
|---|---|---|
| **Source of sea level rise** | **1961 – 2003** | **1993 – 2003** |
| Thermal expansion | 0.42 ± 0.12 | 1.6 ± 0.5 |
| Glaciers and ice caps | 0.50 ± 0.18 | 0.77 ± 0.22 |
| Greenland ice sheet | 0.05 ± 0.12 | 0.21 ± 0.07 |
| Antarctic ice sheet | 0.14 ± 0.41 | 0.21 ± 0.35 |
| Sum of individual climate contributions to sea level rise | 1.1 ± 0.5 | 2.8 ± 0.7 |
| Observed total sea level rise | 1.8 ± 0.5[a] | 3.1 ± 0.7[a] |
| Difference (Observed minus sum of estimated climate contributions) | 0.7 ± 0.7 | 0.3 ± 1.0 |

Table note:
[a] Data prior to 1993 are from tide gauges and after 1993 are from satellite altimetry.

- Mountain glaciers and snow cover have declined on average in both hemispheres. Widespread decreases in glaciers and ice caps have contributed to sea level rise (ice caps do not include contributions from the Greenland and Antarctic ice sheets). (See Table SPM-1.) {4.6, 4.7, 4.8, 5.5}

- New data since the TAR now show that losses from the ice sheets of Greenland and Antarctica have *very likely* contributed to sea level rise over 1993 to 2003 (see Table SPM-1). Flow speed has increased for some Greenland and Antarctic outlet glaciers, which drain ice from the interior of the ice sheets. The corresponding increased ice sheet mass loss has often followed thinning, reduction or loss of ice shelves or loss of floating glacier tongues. Such dynamical ice loss is sufficient to explain most of the Antarctic net mass loss and approximately half of the Greenland net mass loss. The remainder of the ice loss from Greenland has occurred because losses due to melting have exceeded accumulation due to snowfall. {4.6, 4.8, 5.5}

- Global average sea level rose at an average rate of 1.8 [1.3 to 2.3] mm per year over 1961 to 2003. The rate was faster over 1993 to 2003, about 3.1 [2.4 to 3.8] mm per year. Whether the faster rate for 1993 to 2003 reflects decadal variability or an increase in the longer-term trend is unclear. There is *high confidence* that the rate of observed sea level rise increased from the 19th to the 20th century. The total 20th century rise is estimated to be 0.17 [0.12 to 0.22] m. {5.5}

- For 1993-2003, the sum of the climate contributions is consistent within uncertainties with the total sea level rise that is directly observed (see Table SPM-1). These estimates are based on improved satellite and *in-situ* data now available. For the period of 1961 to 2003, the sum of climate contributions is estimated to be smaller than the observed sea level rise. The TAR reported a similar discrepancy for 1910 to 1990. {5.5}

**At continental, regional, and ocean basin scales, numerous long-term changes in climate have been observed. These include changes in Arctic temperatures and ice, widespread changes in precipitation amounts, ocean salinity, wind patterns and aspects of extreme weather including droughts, heavy precipitation, heat waves and the intensity of tropical cyclones[10]. {3.2, 3.3, 3.4, 3.5, 3.6, 5.2}**

- Average Arctic temperatures increased at almost twice the global average rate in the past 100 years. Arctic temperatures have high decadal variability, and a warm period was also observed from 1925 to 1945. {3.2}

- Satellite data since 1978 show that annual average Arctic sea ice extent has shrunk by 2.7 [2.1 to 3.3]% per decade, with larger decreases in summer of 7.4 [5.0 to 9.8]% per decade. These values are consistent with those reported in the TAR. {4.4}

- Temperatures at the top of the permafrost layer have generally increased since the 1980s in the Arctic (by up to 3°C). The maximum area covered by seasonally frozen ground has decreased by about 7% in the Northern Hemisphere since 1900, with a decrease in spring of up to 15%. {4.7}

- Long-term trends from 1900 to 2005 have been observed in precipitation amount over many large regions[11]. Significantly increased precipitation has been observed in eastern parts of North and South America, northern Europe and northern and central Asia. Drying has been observed in the Sahel, the Mediterranean, southern Africa and parts of southern Asia. Precipitation is highly variable spatially and temporally, and data are limited in some regions. Long-term trends have not been observed for the other large regions assessed[11]. {3.3, 3.9}

- Changes in precipitation and evaporation over the oceans are suggested by freshening of mid and high latitude waters together with increased salinity in low latitude waters. {5.2}

- Mid-latitude westerly winds have strengthened in both hemispheres since the 1960s. {3.5}

- More intense and longer droughts have been observed over wider areas since the 1970s, particularly in the tropics and subtropics. Increased drying linked with higher temperatures and decreased precipitation have contributed to changes in drought. Changes in sea surface temperatures (SST), wind patterns, and decreased snowpack and snow cover have also been linked to droughts. {3.3}

- The frequency of heavy precipitation events has increased over most land areas, consistent with warming and observed increases of atmospheric water vapour. {3.8, 3.9}

- Widespread changes in extreme temperatures have been observed over the last 50 years. Cold days, cold nights and frost have become less frequent, while hot days, hot nights, and heat waves have become more frequent (see Table SPM-2). {3.8}

- There is observational evidence for an increase of intense tropical cyclone activity in the North Atlantic since about 1970, correlated with increases of tropical sea surface temperatures. There are also suggestions of increased intense tropical cyclone activity in some other regions where concerns over data quality are greater. Multi-decadal variability and the quality of the tropical cyclone records prior to routine satellite observations in about 1970 complicate the detection of long-term trends in tropical cyclone activity. There is no clear trend in the annual numbers of tropical cyclones. {3.8}

---

[10] Tropical cyclones include hurricanes and typhoons.

[11] The assessed regions are those considered in the regional projections Chapter of the TAR and in Chapter 11 of this Report.

**Table SPM-2.** Recent trends, assessment of human influence on the trend, and projections for extreme weather events for which there is an observed late 20th century trend. {Tables 3.7, 3.8, 9.4, Sections 3.8, 5.5, 9.7, 11.2-11.9}

| Phenomenon[a] and direction of trend | Likelihood that trend occurred in late 20th century (typically post 1960) | Likelihood of a human contribution to observed trend [b] | Likelihood of future trends based on projections for 21st century using SRES scenarios |
|---|---|---|---|
| Warmer and fewer cold days and nights over most land areas | Very likely [c] | Likely [d] | Virtually certain [d] |
| Warmer and more frequent hot days and nights over most land areas | Very likely [e] | Likely (nights) [d] | Virtually certain [d] |
| Warm spells / heat waves. Frequency increases over most land areas | Likely | More likely than not [f] | Very likely |
| Heavy precipitation events. Frequency (or proportion of total rainfall from heavy falls) increases over most areas | Likely | More likely than not [f] | Very likely |
| Area affected by droughts increases | Likely in many regions since 1970s | More likely than not | Likely |
| Intense tropical cyclone activity increases | Likely in some regions since 1970 | More likely than not [f] | Likely |
| Increased incidence of extreme high sea level (excludes tsunamis) [g] | Likely | More likely than not [f, h] | Likely [i] |

Table notes:

[a] See Table 3.7 for further details regarding definitions.

[b] See Table TS-4, Box TS.3.4 and Table 9.4.

[c] Decreased frequency of cold days and nights (coldest 10%).

[d] Warming of the most extreme days and nights each year.

[e] Increased frequency of hot days and nights (hottest 10%).

[f] Magnitude of anthropogenic contributions not assessed. Attribution for these phenomena based on expert judgement rather than formal attribution studies.

[g] Extreme high sea level depends on average sea level and on regional weather systems. It is defined here as the highest 1% of hourly values of observed sea level at a station for a given reference period.

[h] Changes in observed extreme high sea level closely follow the changes in average sea level {5.5.2.6}. It is *very likely* that anthropogenic activity contributed to a rise in average sea level. {9.5.2}

[i] In all scenarios, the projected global average sea level at 2100 is higher than in the reference period {10.6}. The effect of changes in regional weather systems on sea level extremes has not been assessed.

## Some aspects of climate have not been observed to change. {3.2, 3.8, 4.4, 5.3}

- A decrease in diurnal temperature range (DTR) was reported in the TAR, but the data available then extended only from 1950 to 1993. Updated observations reveal that DTR has not changed from 1979 to 2004 as both day- and night-time temperature have risen at about the same rate. The trends are highly variable from one region to another. {3.2}

- Antarctic sea ice extent continues to show inter-annual variability and localized changes but no statistically significant average trends, consistent with the lack of warming reflected in atmospheric temperatures averaged across the region. {3.2, 4.4}

- There is insufficient evidence to determine whether trends exist in the meridional overturning circulation of the global ocean or in small scale phenomena such as tornadoes, hail, lightning and dust-storms. {3.8, 5.3}

A PALEOCLIMATIC PERSPECTIVE

Paleoclimatic studies use changes in climatically sensitive indicators to infer past changes in global climate on time scales ranging from decades to millions of years. Such proxy data (e.g., tree ring width) may be influenced by both local temperature and other factors such as precipitation, and are often representative of particular seasons rather than full years. Studies since the TAR draw increased confidence from additional data showing coherent behaviour across multiple indicators in different parts of the world. However, uncertainties generally increase with time into the past due to increasingly limited spatial coverage.

**Paleoclimate information supports the interpretation that the warmth of the last half century is unusual in at least the previous 1300 years. The last time the polar regions were significantly warmer than present for an extended period (about 125,000 years ago), reductions in polar ice volume led to 4 to 6 metres of sea level rise. {6.4, 6.6}**

- Average Northern Hemisphere temperatures during the second half of the 20th century were *very likely* higher than during any other 50-year period in the last 500 years and *likely* the highest in at least the past 1300 years. Some recent studies indicate greater variability in Northern Hemisphere temperatures than suggested in the TAR, particularly finding that cooler periods existed in the 12 to 14th, 17th, and 19th centuries. Warmer periods prior to the 20th century are within the uncertainty range given in the TAR. {6.6}

- Global average sea level in the last interglacial period (about 125,000 years ago) was *likely* 4 to 6 m higher than during the 20th century, mainly due to the retreat of polar ice. Ice core data indicate that average polar temperatures at that time were 3 to 5°C higher than present, because of differences in the Earth's orbit. The Greenland ice sheet and other Arctic ice fields *likely* contributed no more than 4 m of the observed sea level rise. There may also have been a contribution from Antarctica. {6.4}

UNDERSTANDING AND ATTRIBUTING CLIMATE CHANGE

This Assessment considers longer and improved records, an expanded range of observations, and improvements in the simulation of many aspects of climate and its variability based on studies since the TAR. It also considers the results of new attribution studies that have evaluated whether observed changes are quantitatively consistent with the expected response to external forcings and inconsistent with alternative physically plausible explanations.

**Most of the observed increase in globally averaged temperatures since the mid-20th century is *very likely* due to the observed increase in anthropogenic greenhouse gas concentrations[12]. This is an advance since the TAR's conclusion that "most of the observed warming over the last 50 years is *likely* to have been due to the increase in greenhouse gas concentrations". Discernible human influences now extend to other aspects of climate, including ocean warming, continental-average temperatures, temperature extremes and wind patterns (see Figure SPM-4 and Table SPM-2). {9.4, 9.5}**

- It is *likely* that increases in greenhouse gas concentrations alone would have caused more warming than observed because volcanic and anthropogenic aerosols have offset some warming that would otherwise have taken place. {2.9, 7.5, 9.4}

- The observed widespread warming of the atmosphere and ocean, together with ice mass loss, support the conclusion that it is *extremely unlikely* that global climate change of the past fifty years can be explained without external forcing, and *very likely* that it is not due to known natural causes alone. {4.8, 5.2, 9.4, 9.5, 9.7}

---

[12] Consideration of remaining uncertainty is based on current methodologies.

- Warming of the climate system has been detected in changes of surface and atmospheric temperatures, temperatures in the upper several hundred metres of the ocean and in contributions to sea level rise. Attribution studies have established anthropogenic contributions to all of these changes. The observed pattern of tropospheric warming and stratospheric cooling is *very likely* due to the combined influences of greenhouse gas increases and stratospheric ozone depletion. {3.2, 3.4, 9.4, 9.5}

- It is *likely* that there has been significant anthropogenic warming over the past 50 years averaged over each continent except Antarctica (see Figure SPM-4). The observed patterns of warming, including greater warming over land than over the ocean, and their changes over time, are only simulated by models that include anthropogenic forcing. The ability of coupled climate models to simulate the observed temperature evolution on each of six continents provides stronger evidence of human influence on climate than was available in the TAR. {3.2, 9.4}

# Global and Continental Temperature Change



**FIGURE SPM-4.** Comparison of observed continental- and global-scale changes in surface temperature with results simulated by climate models using natural and anthropogenic forcings. Decadal averages of observations are shown for the period 1906–2005 (black line) plotted against the centre of the decade and relative to the corresponding average for 1901–1950. Lines are dashed where spatial coverage is less than 50%. Blue shaded bands show the 5–95% range for 19 simulations from 5 climate models using only the natural forcings due to solar activity and volcanoes. Red shaded bands show the 5–95% range for 58 simulations from 14 climate models using both natural and anthropogenic forcings. {FAQ 9.2, Figure 1}

- Difficulties remain in reliably simulating and attributing observed temperature changes at smaller scales. On these scales, natural climate variability is relatively larger making it harder to distinguish changes expected due to external forcings. Uncertainties in local forcings and feedbacks also make it difficult to estimate the contribution of greenhouse gas increases to observed small-scale temperature changes. {8.3, 9.4}

- Anthropogenic forcing is *likely* to have contributed to changes in wind patterns[13], affecting extra-tropical storm tracks and temperature patterns in both hemispheres. However, the observed changes in the Northern Hemisphere circulation are larger than simulated in response to 20th century forcing change. {3.5, 3.6, 9.5, 10.3}

- Temperatures of the most extreme hot nights, cold nights and cold days are *likely* to have increased due to anthropogenic forcing. It is *more likely than not* that anthropogenic forcing has increased the risk of heat waves (see Table SPM-2). {9.4}

**Analysis of climate models together with constraints from observations enables an assessed *likely* range to be given for climate sensitivity for the first time and provides increased confidence in the understanding of the climate system response to radiative forcing. {6.6, 8.6, 9.6, Box 10.2}**

- The equilibrium climate sensitivity is a measure of the climate system response to sustained radiative forcing. It is not a projection but is defined as the global average surface warming following a doubling of carbon dioxide concentrations. It is *likely* to be in the range 2 to 4.5°C with a best estimate of about 3°C, and is *very unlikely* to be less than 1.5°C. Values substantially higher than 4.5°C cannot be excluded, but agreement of models with observations is not as good for those values. Water vapour changes represent the largest feedback affecting climate sensitivity and are now better understood than in the TAR. Cloud feedbacks remain the largest source of uncertainty. {8.6, 9.6, Box 10.2}

- It is *very unlikely* that climate changes of at least the seven centuries prior to 1950 were due to variability generated within the climate system alone. A significant fraction of the reconstructed Northern Hemisphere interdecadal temperature variability over those centuries is *very likely* attributable to volcanic eruptions and changes in solar irradiance, and it is *likely* that anthropogenic forcing contributed to the early 20th century warming evident in these records. {2.7, 2.8, 6.6, 9.3}

PROJECTIONS OF FUTURE CHANGES IN CLIMATE

A major advance of this assessment of climate change projections compared with the TAR is the large number of simulations available from a broader range of models. Taken together with additional information from observations, these provide a quantitative basis for estimating likelihoods for many aspects of future climate change. Model simulations cover a range of possible futures including idealised emission or concentration assumptions. These include SRES[14] illustrative marker scenarios for the 2000–2100 period and model experiments with greenhouse gases and aerosol concentrations held constant after year 2000 or 2100.

**For the next two decades a warming of about 0.2°C per decade is projected for a range of SRES emission scenarios. Even if the concentrations of all greenhouse gases and aerosols had been kept constant at year 2000 levels, a further warming of about 0.1°C per decade would be expected. {10.3, 10.7}**

---

[13] In particular, the Southern and Northern Annular Modes and related changes in the North Atlantic Oscillation. {3.6, 9.5, Box TS.3.1}

[14] SRES refers to the IPCC Special Report on Emission Scenarios (2000). The SRES scenario families and illustrative cases, which did not include additional climate initiatives, are summarized in a box at the end of this Summary for Policymakers. Approximate $CO_2$ equivalent concentrations corresponding to the computed radiative forcing due to anthropogenic greenhouse gases and aerosols in 2100 (see p. 823 of the TAR) for the SRES B1, A1T, B2, A1B, A2 and A1FI illustrative marker scenarios are about 600, 700, 800, 850, 1250 and 1550 ppm respectively. Scenarios B1, A1B, and A2 have been the focus of model inter-comparison studies and many of those results are assessed in this report.

- Since IPCC's first report in 1990, assessed projections have suggested global averaged temperature increases between about 0.15 and 0.3°C per decade for 1990 to 2005. This can now be compared with observed values of about 0.2°C per decade, strengthening confidence in near-term projections. {1.2, 3.2}

- Model experiments show that even if all radiative forcing agents are held constant at year 2000 levels, a further warming trend would occur in the next two decades at a rate of about 0.1°C per decade, due mainly to the slow response of the oceans. About twice as much warming (0.2°C per decade) would be expected if emissions are within the range of the SRES scenarios. Best-estimate projections from models indicate that decadal-average warming over each inhabited continent by 2030 is insensitive to the choice among SRES scenarios and is *very likely* to be at least twice as large as the corresponding model-estimated natural variability during the 20th century. {9.4, 10.3, 10.5, 11.2–11.7, Figure TS-29}

**Continued greenhouse gas emissions at or above current rates would cause further warming and induce many changes in the global climate system during the 21st century that would *very likely* be larger than those observed during the 20th century. {10.3}**

- Advances in climate change modelling now enable best estimates and *likely* assessed uncertainty ranges to be given for projected warming for different emission scenarios. Results for different emission scenarios are provided explicitly in this report to avoid loss of this policy-relevant information. Projected globally-averaged surface warmings for the end of the 21st century (2090–2099) relative to 1980–1999 are shown in Table SPM-3. These illustrate the differences between lower to higher SRES emission scenarios and the projected warming uncertainty associated with these scenarios. {10.5}

- Best estimates and *likely* ranges for globally average surface air warming for six SRES emissions marker scenarios are given in this assessment and are shown in Table SPM-3. For example, the best estimate for the low scenario (B1) is 1.8°C (*likely* range is 1.1°C to 2.9°C), and the best estimate for the high scenario (A1FI) is 4.0°C (*likely* range is 2.4°C to 6.4°C). Although these projections are broadly consistent with the span quoted in the TAR (1.4 to 5.8°C), they are not directly comparable (see Figure SPM-5). The AR4 is more advanced as it provides best estimates and an assessed likelihood range for each of the marker scenarios. The new assessment of the *likely* ranges now relies on a larger number of climate models of increasing complexity and realism, as well as new information regarding the nature of feedbacks from the carbon cycle and constraints on climate response from observations. {10.5}

**Table SPM-3.** Projected globally averaged surface warming and sea level rise at the end of the 21st century. {10.5, 10.6, Table 10.7}

| Case | Temperature Change (°C at 2090-2099 relative to 1980-1999) [a] | | Sea Level Rise (m at 2090-2099 relative to 1980-1999) |
|---|---|---|---|
| | Best estimate | *Likely* range | Model-based range excluding future rapid dynamical changes in ice flow |
| Constant Year 2000 concentrations [b] | 0.6 | 0.3 – 0.9 | NA |
| B1 scenario | 1.8 | 1.1 – 2.9 | 0.18 – 0.38 |
| A1T scenario | 2.4 | 1.4 – 3.8 | 0.20 – 0.45 |
| B2 scenario | 2.4 | 1.4 – 3.8 | 0.20 – 0.43 |
| A1B scenario | 2.8 | 1.7 – 4.4 | 0.21 – 0.48 |
| A2 scenario | 3.4 | 2.0 – 5.4 | 0.23 – 0.51 |
| A1FI scenario | 4.0 | 2.4 – 6.4 | 0.26 – 0.59 |

Table notes:

[a] These estimates are assessed from a hierarchy of models that encompass a simple climate model, several Earth Models of Intermediate Complexity (EMICs), and a large number of Atmosphere-Ocean Global Circulaion Models (AOGCMs).

[b] Year 2000 constant composition is derived from AOGCMs only.

## Multi-model Averages and Assessed Ranges for Surface Warming



**FIGURE SPM-5.** Solid lines are multi-model global averages of surface warming (relative to 1980-99) for the scenarios A2, A1B and B1, shown as continuations of the 20th century simulations. Shading denotes the plus/minus one standard deviation range of individual model annual averages. The orange line is for the experiment where concentrations were held constant at year 2000 values. The gray bars at right indicate the best estimate (solid line within each bar) and the *likely* range assessed for the six SRES marker scenarios. The assessment of the best estimate and *likely* ranges in the gray bars includes the AOGCMs in the left part of the figure, as well as results from a hierarchy of independent models and observational constraints. {Figures 10.4 and 10.29}

- Warming tends to reduce land and ocean uptake of atmospheric carbon dioxide, increasing the fraction of anthropogenic emissions that remains in the atmosphere. For the A2 scenario, for example, the climate-carbon cycle feedback increases the corresponding global average warming at 2100 by more than 1°C. Assessed upper ranges for temperature projections are larger than in the TAR (see Table SPM-3) mainly because the broader range of models now available suggests stronger climate-carbon cycle feedbacks. {7.3, 10.5}

- Model-based projections of global average sea level rise at the end of the 21st century (2090-2099) are shown in Table SPM-3. For each scenario, the midpoint of the range in Table SPM-3 is within 10% of the TAR model average for 2090-2099. The ranges are narrower than in the TAR mainly because of improved information about some uncertainties in the projected contributions[15]. {10.6}

- Models used to date do not include uncertainties in climate-carbon cycle feedback nor do they include the full effects of changes in ice sheet flow, because a basis in published literature is lacking. The projections include a contribution due to increased ice flow from Greenland and Antarctica at the rates observed for 1993-2003, but these flow rates could increase or decrease in the future. For example, if this contribution were to grow

---

[15] TAR projections were made for 2100, whereas projections in this Report are for 2090-2099. The TAR would have had similar ranges to those in Table SPM-2 if it had treated the uncertainties in the same way.

linearly with global average temperature change, the upper ranges of sea level rise for SRES scenarios shown in Table SPM-3 would increase by 0.1 m to 0.2 m. Larger values cannot be excluded, but understanding of these effects is too limited to assess their likelihood or provide a best estimate or an upper bound for sea level rise. {10.6}

- Increasing atmospheric carbon dioxide concentrations leads to increasing acidification of the ocean. Projections based on SRES scenarios give reductions in average global surface ocean pH[16] of between 0.14 and 0.35 units over the 21st century, adding to the present decrease of 0.1 units since pre-industrial times. {5.4, Box 7.3, 10.4}

**There is now higher confidence in projected patterns of warming and other regional-scale features, including changes in wind patterns, precipitation, and some aspects of extremes and of ice. {8.2, 8.3, 8.4, 8.5, 9.4, 9.5, 10.3, 11.1}**

- Projected warming in the 21st century shows scenario-independent geographical patterns similar to those observed over the past several decades. Warming is expected to be greatest over land and at most high northern latitudes, and least over the Southern Ocean and parts of the North Atlantic ocean (see Figure SPM-6). {10.3}

### AOGCM Projections of Surface Temperatures



**FIGURE SPM-6.** Projected surface temperature changes for the early and late 21st century relative to the period 1980–1999. The central and right panels show the Atmosphere-Ocean General Circulation multi-Model average projections for the B1 (top), A1B (middle) and A2 (bottom) SRES scenarios averaged over decades 2020–2029 (center) and 2090–2099 (right). The left panel shows corresponding uncertainties as the relative probabilities of estimated global average warming from several different AOGCM and EMICs studies for the same periods. Some studies present results only for a subset of the SRES scenarios, or for various model versions. Therefore the difference in the number of curves, shown in the left-hand panels, is due only to differences in the availability of results. {Figures 10.8 and 10.28}

---

[16] Decreases in pH correspond to increases in acidity of a solution. See Glossary for further details.

- Snow cover is projected to contract. Widespread increases in thaw depth are projected over most permafrost regions. {10.3, 10.6}

- Sea ice is projected to shrink in both the Arctic and Antarctic under all SRES scenarios. In some projections, Arctic late-summer sea ice disappears almost entirely by the latter part of the 21st century. {10.3}

- It is *very likely* that hot extremes, heat waves, and heavy precipitation events will continue to become more frequent. {10.3}

- Based on a range of models, it is *likely* that future tropical cyclones (typhoons and hurricanes) will become more intense, with larger peak wind speeds and more heavy precipitation associated with ongoing increases of tropical SSTs. There is less confidence in projections of a global decrease in numbers of tropical cyclones. The apparent increase in the proportion of very intense storms since 1970 in some regions is much larger than simulated by current models for that period. {9.5, 10.3, 3.8}

- Extra-tropical storm tracks are projected to move poleward, with consequent changes in wind, precipitation, and temperature patterns, continuing the broad pattern of observed trends over the last half-century. {3.6, 10.3}

- Since the TAR there is an improving understanding of projected patterns of precipitation. Increases in the amount of precipitation are *very likely* in high-latitudes, while decreases are *likely* in most subtropical land regions (by as much as about 20% in the A1B scenario in 2100, see Figure SPM-7), continuing observed patterns in recent trends. {3.3, 8.3, 9.5, 10.3, 11.2 to 11.9}

- Based on current model simulations, it is *very likely* that the meridional overturning circulation (MOC) of the Atlantic Ocean will slow down during the 21st century. The multi-model average reduction by 2100 is 25% (range from zero to about 50%) for SRES emission scenario A1B. Temperatures in the Atlantic region are projected to increase despite such changes due to the much larger warming associated with projected increases of greenhouse gases. It is *very unlikely* that the MOC will undergo a large abrupt transition during the 21st century. Longer-term changes in the MOC cannot be assessed with confidence. {10.3, 10.7}

## Projected Patterns of Precipitation Changes



**FIGURE SPM-7.** Relative changes in precipitation (in percent) for the period 2090–2099, relative to 1980–1999. Values are multi-model averages based on the SRES A1B scenario for December to February (left) and June to August (right). White areas are where less than 66% of the models agree in the sign of the change and stippled areas are where more than 90% of the models agree in the sign of the change. {Figure 10.9}

**Anthropogenic warming and sea level rise would continue for centuries due to the timescales associated with climate processes and feedbacks, even if greenhouse gas concentrations were to be stabilized. {10.4, 10.5, 10.7}**

- Climate carbon cycle coupling is expected to add carbon dioxide to the atmosphere as the climate system warms, but the magnitude of this feedback is uncertain. This increases the uncertainty in the trajectory of carbon dioxide emissions required to achieve a particular stabilisation level of atmospheric carbon dioxide concentration. Based on current understanding of climate carbon cycle feedback, model studies suggest that to stabilise at 450 ppm carbon dioxide, could require that cumulative emissions over the 21st century be reduced from an average of approximately 670 [630 to 710] GtC (2460 [2310 to 2600] GtCO$_2$) to approximately 490 [375 to 600] GtC (1800 [1370 to 2200] GtCO$_2$). Similarly, to stabilise at 1000 ppm this feedback could require that cumulative emissions be reduced from a model average of approximately 1415 [1340 to 1490] GtC (5190 [4910 to 5460] GtCO$_2$) to approximately 1100 [980 to 1250] GtC (4030 [3590 to 4580] GtCO$_2$). {7.3, 10.4}

- If radiative forcing were to be stabilized in 2100 at B1 or A1B levels[11] a further increase in global average temperature of about 0.5°C would still be expected, mostly by 2200. {10.7}

- If radiative forcing were to be stabilized in 2100 at A1B levels[11], thermal expansion alone would lead to 0.3 to 0.8 m of sea level rise by 2300 (relative to 1980–1999). Thermal expansion would continue for many centuries, due to the time required to transport heat into the deep ocean. {10.7}

- Contraction of the Greenland ice sheet is projected to continue to contribute to sea level rise after 2100. Current models suggest ice mass losses increase with temperature more rapidly than gains due to precipitation and that the surface mass balance becomes negative at a global average warming (relative to pre-industrial values) in excess of 1.9 to 4.6°C. If a negative surface mass balance were sustained for millennia, that would lead to virtually complete elimination of the Greenland ice sheet and a resulting contribution to sea level rise of about 7 m. The corresponding future temperatures in Greenland are comparable to those inferred for the last interglacial period 125,000 years ago, when paleoclimatic information suggests reductions of polar land ice extent and 4 to 6 m of sea level rise. {6.4, 10.7}

- Dynamical processes related to ice flow not included in current models but suggested by recent observations could increase the vulnerability of the ice sheets to warming, increasing future sea level rise. Understanding of these processes is limited and there is no consensus on their magnitude. {4.6, 10.7}

- Current global model studies project that the Antarctic ice sheet will remain too cold for widespread surface melting and is expected to gain in mass due to increased snowfall. However, net loss of ice mass could occur if dynamical ice discharge dominates the ice sheet mass balance. {10.7}

- Both past and future anthropogenic carbon dioxide emissions will continue to contribute to warming and sea level rise for more than a millennium, due to the timescales required for removal of this gas from the atmosphere. {7.3, 10.3}

---

**The Emission Scenarios of the IPCC Special Report on Emission Scenarios (SRES)[17]**

A1. The A1 storyline and scenario family describes a future world of very rapid economic growth, global population that peaks in mid-century and declines thereafter, and the rapid introduction of new and more efficient technologies. Major underlying themes are convergence among regions, capacity building and increased cultural and social interactions, with a substantial reduction in regional differences in per capita income. The A1 scenario family develops into three groups that describe alternative directions of technological change in the energy system. The three A1 groups are distinguished by their technological emphasis: fossil intensive (A1FI), non-fossil energy sources (A1T), or a balance across all sources (A1B) (where balanced is defined as not relying too heavily on one particular energy source, on the assumption that similar improvement rates apply to all energy supply and end use technologies).

A2. The A2 storyline and scenario family describes a very heterogeneous world. The underlying theme is self reliance and preservation of local identities. Fertility patterns across regions converge very slowly, which results in continuously increasing population. Economic development is primarily regionally oriented and per capita economic growth and technological change more fragmented and slower than other storylines.

B1. The B1 storyline and scenario family describes a convergent world with the same global population, that peaks in mid-century and declines thereafter, as in the A1 storyline, but with rapid change in economic structures toward a service and information economy, with reductions in material intensity and the introduction of clean and resource efficient technologies. The emphasis is on global solutions to economic, social and environmental sustainability, including improved equity, but without additional climate initiatives.

B2. The B2 storyline and scenario family describes a world in which the emphasis is on local solutions to economic, social and environmental sustainability. It is a world with continuously increasing global population, at a rate lower than A2, intermediate levels of economic development, and less rapid and more diverse technological change than in the B1 and A1 storylines. While the scenario is also oriented towards environmental protection and social equity, it focuses on local and regional levels.

An illustrative scenario was chosen for each of the six scenario groups A1B, A1FI, A1T, A2, B1 and B2. All should be considered equally sound.

The SRES scenarios do not include additional climate initiatives, which means that no scenarios are included that explicitly assume implementation of the United Nations Framework Convention on Climate Change or the emissions targets of the Kyoto Protocol.

---

[17] Emission scenarios are not assessed in this Working Group One report of the IPCC. This box summarizing the SRES scenarios is taken from the TAR and has been subject to prior line by line approval by the Panel.

**EXHIBIT 2**





PRINTER-FRIENDLY FORMAT
SPONSORED BY

February 3, 2007

# Science Panel Calls Global Warming 'Unequivocal'

**By ELISABETH ROSENTHAL and ANDREW C. REVKIN**

PARIS, Feb. 2 — In a grim and powerful assessment of the future of the planet, the leading international network of climate scientists has concluded for the first time that global warming is "unequivocal" and that human activity is the main driver, "very likely" causing most of the rise in temperatures since 1950.

They said the world was in for centuries of climbing temperatures, rising seas and shifting weather patterns — unavoidable results of the buildup of heat-trapping gases in the atmosphere.

But their report, released here on Friday by the Intergovernmental Panel on Climate Change, said warming and its harmful consequences could be substantially blunted by prompt action.

While the report provided scant new evidence of a climate apocalypse now, and while it expressly avoided recommending courses of action, officials from the United Nations agencies that created the panel in 1988 said it spoke of the urgent need to limit looming and momentous risks.

"In our daily lives we all respond urgently to dangers that are much less likely than climate change to affect the future of our children," said Achim Steiner, executive director of the United Nations Environment Program, which administers the panel along with the World Meteorological Organization.

"Feb. 2 will be remembered as the date when uncertainty was removed as to whether humans had anything to do with climate change on this planet," he went on. "The evidence is on the table."

The report is the panel's fourth assessment since 1990 on the causes and consequences of climate change, but it is the first in which the group asserts with near certainty — more than 90 percent confidence — that carbon dioxide and other greenhouse gases from human activities have been the main causes of warming in the past half century.

In its last report, in 2001, the panel, consisting of hundreds of scientists and reviewers, said the confidence level for its projections was "likely," or 66 to 90 percent. That level has now been raised to "very likely," better than 90 percent. Both reports are online at www.ipcc.ch.

The Bush administration, which until recently avoided directly accepting that humans were warming the planet in potentially harmful ways, embraced the findings, which had been approved by representatives from the United States and 112 other countries on Thursday night.

Administration officials asserted Friday that the United States had played a leading role in studying and combating climate change, in part by an investment of an average of almost $5 billion a year for the past six years in research and tax incentives for new technologies.

At the same time, Secretary of Energy Samuel Bodman rejected the idea of unilateral limits on emissions. "We are a small contributor to the overall, when you look at the rest of the world, so it's really got to be a

global solution," he said.

The United States, with about 5 percent of the world's population, contributes about a quarter of greenhouse gas emissions, more than any other country.

Democratic lawmakers quickly fired off a round of news releases using the report to bolster a fresh flock of proposed bills aimed at cutting emissions of greenhouse gases. Senator James M. Inhofe, the Oklahoma Republican who has called the idea of dangerous human-driven warming a hoax, issued a news release headed "Corruption of Science" that rejected the report as "a political document."

The new report says the global climate is likely to warm 3.5 to 8 degrees Fahrenheit if carbon dioxide concentrations in the atmosphere reach twice the levels of 1750, before the Industrial Revolution.

Many energy and environment experts see such a doubling, or worse, as a foregone conclusion after 2050 unless there is a prompt and sustained shift away from the 20th-century pattern of unfettered burning of coal and oil, the main sources of carbon dioxide, and an aggressive expansion of nonpolluting sources of energy.

And the report says there is a more than a 1-in-10 chance of much greater warming, a risk that many experts say is far too high to ignore.

Even a level of warming that falls in the middle of the group's range of projections would be likely to cause significant stress to ecosystems, according to many climate experts and biologists. And it would alter longstanding climate patterns that shape water supplies and agricultural production.

Moreover, the warming has set in motion a rise in global sea levels, the report says. It forecasts a rise of 7 to 23 inches by 2100 and concludes that seas will continue to rise for at least 1,000 years to come. By comparison, seas rose about 6 to 9 inches in the 20th century.

John P. Holdren, an energy and climate expert at Harvard, said the report "powerfully underscores the need for a massive effort to slow the pace of global climatic disruption before intolerable consequences become inevitable."

"Since 2001, there has been a torrent of new scientific evidence on the magnitude, human origins and growing impacts of the climatic changes that are under way," said Mr. Holdren, who is the president of the American Association for the Advancement of Science. "In overwhelming proportions, this evidence has been in the direction of showing faster change, more danger and greater confidence about the dominant role of fossil-fuel burning and tropical deforestation in causing the changes that are being observed."

The conclusions came after a three-year review of hundreds of studies of past climate shifts; observations of retreating ice, warming and rising seas, and other changes around the planet; and a greatly expanded suite of supercomputer simulations used to test how the earth will respond to a growing blanket of gases that hold heat in the atmosphere.

The section released Friday was a 20-page summary for policymakers, which was approved early in the morning by teams of officials from more than 100 countries after three days and nights of wrangling over wording with the lead authors, all of whom are scientists.

It described far-flung ramifications for both humans and nature.

"It is very likely that hot extremes, heat waves and heavy precipitation events will continue to become more frequent," said the summary.

Generally, the scientists said, more precipitation will fall at higher latitudes, which are also likely to see lengthened growing seasons. Semi-arid subtropical regions, already chronically plagued by drought, could have a further 20 percent drop in rainfall under the panel's midrange outlook for increases in the greenhouse gases.

The summary added a new chemical consequence of the buildup of carbon dioxide to the list of mainly climatic and biological effects foreseen in its previous reports: a drop in the pH of seawater as oceans absorb billions of tons of carbon dioxide, which forms carbonic acid when partly dissolved. The ocean would stay alkaline, but marine biologists have said that a change in the direction of acidity could imperil some kinds of corals and plankton.

The report essentially caps a half-century-long effort to discern whether humans, through the buildup of carbon dioxide and other gases released mainly by burning fuels and forests, could influence the earth's climate system in potentially momentous ways.

The group operates under the aegis of the United Nations and was chartered in 1988 — a year of record heat, burning forests and the first big headlines about global warming — to provide regular reviews of climate science to governments to inform policy choices.

Government officials are involved in shaping the summary of each report, but the scientist-authors, who are unpaid, have the final say over the thousands of pages in four underlying technical reports that will be completed and published later this year.

Big questions remain about the speed and extent of some impending changes, both because of uncertainty about future population and pollution trends and the complex interrelationships of the greenhouse emissions, clouds, dusty kinds of pollution, the oceans and earth's veneer of life, which both emits and soaks up carbon dioxide and other such gases.

But a broad array of scientists, including authors of the report and independent experts, said the latest analysis was the most sobering view yet of a century of transition — after thousands of years of relatively stable climate conditions — to a new norm of continual change.

Should greenhouse gases continue to accumulate in the atmosphere at even a moderate pace, average temperatures by the end of the century could match those last seen 125,000 years ago, in the previous warm spell between ice ages, the report said.

At that time, the panel said, sea levels were 12 to 20 feet higher than they are now. Much of that extra water is now trapped in the ice sheets of Greenland and Antarctica, which are eroding in some places.

The panel said there was no solid scientific understanding of how rapidly the vast stores of ice in polar regions will melt, so their estimates on new sea levels were based mainly on how much the warmed oceans will expand, and not on contributions from the melting of ice now on land.

Other scientists have recently reported evidence that the glaciers and ice sheets in the Arctic and Antarctic could flow seaward far more quickly than estimated in the past, and they have proposed that the risks to coastal areas could be much more imminent. But the climate change panel is forbidden by its charter to enter into speculation, and so could not include such possible instabilities in its assessment.

Michel Jarraud, the secretary general of the United Nations World Meteorological Organization, said the lack of clarity should offer no one comfort. "The speed with which melting ice sheets are raising sea levels is uncertain, but the report makes clear that sea levels will rise inexorably over the coming centuries," he said. "It is a question of when and how much, and not if."

The warming and other climate changes will be highly variable around the world, with the Arctic in particular seeing much higher temperatures, said Susan Solomon, the co-leader of the team writing the summary and the section of the panel's report on basic science. She is an atmospheric scientist for the National Oceanic and Atmospheric Administration.

The kinds of vulnerabilities are very much dependent on where you are, Dr. Solomon said in a telephone interview. "If you're living in parts of the tropics and they're getting drier and you're a farmer, there are some very acute issues associated with even small changes in rainfall — changes we're already seeing are significant," she said. "If you are an Inuit and you're seeing your sea ice retreating already, that's affecting your life style and culture."

The 20-page summary is a sketch of the findings that are most germane to the public and world leaders.

The full report, thousands of pages of technical background, will be released in four sections through the year — the first on basic science, then sections on impacts and options for limiting emissions and limiting inevitable harms, and finally a synthesis of all of the findings near year's end.

In a news conference in Paris, Dr. Solomon declined to provide her own views on how society should respond to the momentous changes projected in the study.

"I honestly believe that it would be a much better service for me to keep my personal opinions separate than what I can actually offer the world as a scientist," she said. "My stepson, who is 29, has an utterly different view of risks than I do. People are going to have to make their own judgments."

Some authors of the report said that no one could honestly point to any remaining uncertainties as justification for further delay.

"Policy makers paid us to do good science, and now we have very high scientific confidence in this work — this is real, this is real, this is real," said Richard B. Alley, one of the lead authors and a professor at Pennsylvania State University. "So now act, the ball's back in your court."

*Elisabeth Rosenthal reported from Paris, and Andrew C. Revkin from New York. Felicity Barringer contributed reporting from Washington.*

Copyright 2007 The New York Times Company

**EXHIBIT 3**

1 of 1 DOCUMENT

The Washington Post

January 29, 2006 Sunday
Final Edition

# Debate on Climate Shifts to Issue of Irreparable Change; Some Experts on Global Warming Foresee 'Tipping Point' When It Is Too Late to Act

**BYLINE:** Juliet Eilperin, Washington Post Staff Writer

**SECTION:** A Section; A01

**LENGTH:** 1582 words

Now that most scientists agree human activity is causing Earth to warm, the central debate has shifted to whether climate change is progressing so rapidly that, within decades, humans may be helpless to slow or reverse the trend.

This "tipping point" scenario has begun to consume many prominent researchers in the United States and abroad, because the answer could determine how drastically countries need to reduce their greenhouse gas emissions in the coming years. While scientists remain uncertain when such a point might occur, many say it is urgent that policymakers cut global carbon dioxide emissions in half over the next 50 years or risk the triggering of changes that would be irreversible.

There are three specific events that these scientists describe as especially worrisome and potentially imminent, although the time frames are a matter of dispute: widespread coral bleaching that could damage the world's fisheries within three decades; dramatic sea level rise by the end of the century that would take tens of thousands of years to reverse; and, within 200 years, a shutdown of the ocean current that moderates temperatures in northern Europe.

The debate has been intensifying because Earth is warming much faster than some researchers had predicted. James E. Hansen, who directs NASA's Goddard Institute of Space Studies, last week confirmed that 2005 was the warmest year on record, surpassing 1998. Earth's average temperature has risen nearly 1 degree Fahrenheit over the past 30 years, he noted, and another increase of about 4 degrees over the next century would "imply changes that constitute practically a different planet."

"It's not something you can adapt to," Hansen said in an interview. "We can't let it go on another 10 years like this. We've got to do something."

Princeton University geosciences and international affairs professor Michael Oppenheimer, who also advises the advocacy group Environmental Defense, said one of the greatest dangers lies in the disintegration of the Greenland or West Antarctic ice sheets, which together hold about 20 percent of the fresh water on the planet. If either of the two sheets disintegrates, sea level could rise nearly 20 feet in the course of a couple of centuries, swamping the southern third of Florida and Manhattan up to the middle of Greenwich Village.

While both the Greenland and the Antarctic ice sheets as a whole are gaining some mass in their cold interiors because of increasing snowfall, they are losing ice along their peripheries. That indicates that scientists may have underestimated the rate of disintegration they face in the future, Oppenheimer said. Greenland's current net ice loss is equivalent to an annual 0.008 inch sea level rise.

The effects of the collapse of either ice sheet would be "huge," Oppenheimer said. "Once you lost one of these ice

sheets, there's really no putting it back for thousands of years, if ever."

Last year, the British government sponsored a scientific symposium on "Avoiding Dangerous Climate Change," which examined a number of possible tipping points. A book based on that conference, due to be published Tuesday, suggests that disintegration of the two ice sheets becomes more likely if average temperatures rise by more than 5 degrees Fahrenheit, a prospect "well within the range of climate change projections for this century."

The report concludes that a temperature rise of just 1.8 degrees Fahrenheit "is likely to lead to extensive coral bleaching," destroying critical fish nurseries in the Caribbean and Southeast Asia. Too-warm sea temperatures stress corals, causing them to expel symbiotic micro-algae that live in their tissues and provide them with food, and thus making the reefs appear bleached. Bleaching that lasts longer than a week can kill corals. This fall there was widespread bleaching from Texas to Trinidad that killed broad swaths of corals, in part because ocean temperatures were 2 degrees Fahrenheit above average monthly maximums.

Many scientists are also worried about a possible collapse of the Atlantic thermohaline circulation, a current that brings warm surface water to northern Europe and returns cold, deep-ocean water south. Hans Joachim Schellnhuber, who directs Germany's Potsdam Institute for Climate Impact Research, has run multiple computer models to determine when climate change could disrupt this "conveyor belt," which, according to one study, is already slower than it was 30 years ago. According to these simulations, there is a 50 percent chance the current will collapse within 200 years.

Some scientists, including President Bush's chief science adviser, John H. Marburger III, emphasize there is still much uncertainty about when abrupt global warming might occur.

"There's no agreement on what it is that constitutes a dangerous climate change," said Marburger, adding that the U.S. government spends $2 billion a year on researching this and other climate change questions. "We know things like this are possible, but we don't have enough information to quantify the level of risk."

This tipping point debate has stirred controversy within the administration; Hansen said senior political appointees are trying to block him from sharing his views publicly.

When Hansen posted data on the Internet in the fall suggesting that 2005 could be the warmest year on record, NASA officials ordered Hansen to withdraw the information because he had not had it screened by the administration in advance, according to a Goddard scientist who spoke on the condition of anonymity. More recently, NASA officials tried to discourage a reporter from interviewing Hansen for this article and later insisted he could speak on the record only if an agency spokeswoman listened in on the conversation.

"They're trying to control what's getting out to the public," Hansen said, adding that many of his colleagues are afraid to talk about the issue. "They're not willing to say much, because they've been pressured and they're afraid they'll get into trouble."

But Mary L. Cleave, deputy associate administrator for NASA's Office of Earth Science, said the agency insists on monitoring interviews with scientists to ensure they are not misquoted.

"People could see it as a constraint," Cleave said. "As a manager, I might see it as protection."

John R. Christy, director of the Earth Science System Center at the University of Alabama in Huntsville, said it is possible increased warming will be offset by other factors, such as increased cloudiness that would reflect more sunlight. "Whatever happens, we will adapt to it," Christy said.

Scientists who read the history of Earth's climate in ancient sediments, ice cores and fossils find clear signs that it has shifted abruptly in the past on a scale that could prove disastrous for modern society. Peter B. deMenocal, an associate professor at the Lamont-Doherty Earth Observatory of Columbia University, said that about 8,200 years ago, a very sudden cooling shut down the Atlantic conveyor belt. As a result, the land temperature in Greenland dropped more than 9 degrees Fahrenheit within a decade or two.

"It's not this abstract notion that happens over millions of years," deMenocal said. "The magnitude of what we're talking about greatly, greatly exceeds anything we've withstood in human history."

These kinds of concerns have spurred some governments to make major cuts in the carbon dioxide emissions linked to global warming. Britain has slashed its emissions by 14 percent, compared with 1990 levels, and aims to reduce them by 60 percent by 2050. Some European countries, however, are lagging well behind their targets under the international Kyoto climate treaty.

David Warrilow, who heads science policy on climate change for Britain's Department of Environment, Food and Rural Affairs, said that while the science remains unsettled, his government has decided to take a precautionary approach. He compared consuming massive amounts of fossil fuels to the strategy of the Titanic's crew, who were unable to avoid an iceberg because they were speeding across the Atlantic in hopes of breaking a record.

"We know there are icebergs out there, but at the moment we're accelerating toward the tipping point," Warrilow said in an interview. "This is silly. We should be doing the opposite, slowing down whilst we build up our knowledge base."

The Bush administration espouses a different approach. Marburger said that though everyone agrees carbon dioxide emissions should decline, the United States prefers to promote cleaner technology rather than impose mandatory greenhouse gas limits. "The U.S. is the world leader in doing something on climate change because of its actions on changing technology," he said.

Stanford University climatologist Stephen H. Schneider, who is helping oversee a major international assessment of how climate change could expose humans and the environment to new vulnerabilities, said countries respond differently to the global warming issue in part because they are affected differently by it. The small island nation of Kiribati is made up of 33 small atolls, none of which is more than 6.5 feet above the South Pacific, and it is only a matter of time before the entire country is submerged by the rising sea.

"For Kiribati, the tipping point has already occurred," Schneider said. "As far as they're concerned, it's tipped, but they have no economic clout in the world."

**LOAD-DATE:** January 29, 2006

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newspaper

Copyright 2006 The Washington Post

**EXHIBIT 4**

# ESSAY

**BEYOND THE IVORY TOWER**

# The Scientific Consensus on Climate Change

### Naomi Oreskes

This year's essay series highlights the benefits that scientists, science, and technology have brought to society throughout history.

Policy-makers and the media, particularly in the United States, frequently assert that climate science is highly uncertain. Some have used this as an argument against adopting strong measures to reduce greenhouse gas emissions. For example, while discussing a major U.S. Environmental Protection Agency report on the risks of climate change, then–EPA administrator Christine Whitman argued, "As [the report] went through review, there was less consensus on the science and conclusions on climate change" (1). Some corporations whose revenues might be adversely affected by controls on carbon dioxide emissions have also alleged major uncertainties in the science (2). Such statements suggest that there might be substantive disagreement in the scientific community about the reality of anthropogenic climate change. This is not the case.

*Without substantial disagreement, scientists find human activities are heating the Earth's surface.*

The scientific consensus is clearly expressed in the reports of the Intergovernmental Panel on Climate Change (IPCC). Created in 1988 by the World Meteorological Organization and the United Nations Environmental Programme, IPCC's purpose is to evaluate the state of climate science as a basis for informed policy action, primarily on the basis of peer-reviewed and published scientific literature (3). In its most recent assessment, IPCC states unequivocally that the consensus of scientific opinion is that Earth's climate is being affected by human activities: "Human activities … are modifying the concentration of atmospheric constituents … that absorb or scatter radiant energy. … [M]ost of the observed warming over the last 50 years is likely to have been due to the increase in greenhouse gas concentrations" [p. 21 in (4)].

IPCC is not alone in its conclusions. In recent years, all major scientific bodies in the United States whose members' expertise bears directly on the matter have issued similar statements. For example, the National Academy of Sciences report, *Climate Change Science: An Analysis of Some Key Questions*, begins: "Greenhouse gases are accumulating in Earth's atmosphere as a result of human activities, causing surface air temperatures and subsurface ocean temperatures to rise" [p. 1 in (5)]. The report explicitly asks whether the IPCC assessment is a fair summary of professional scientific thinking, and answers yes: "The IPCC's conclusion that most of the observed warming of the last 50 years is likely to have been due to the increase in greenhouse gas concentrations accurately reflects the current thinking of the scientific community on this issue" [p. 3 in (5)].

Others agree. The American Meteorological Society (6), the American Geophysical Union (7), and the American Association for the Advancement of Science (AAAS) all have issued statements in recent years concluding that the evidence for human modification of climate is compelling (8).

The drafting of such reports and statements involves many opportunities for comment, criticism, and revision, and it is not likely that they would diverge greatly from the opinions of the societies' members. Nevertheless, they might downplay legitimate dissenting opinions. That hypothesis was tested by analyzing 928 abstracts, published in refereed scientific journals between 1993 and 2003, and listed in the ISI database with the keywords "climate change" (9).

The 928 papers were divided into six categories: explicit endorsement of the consensus position, evaluation of impacts, mitigation proposals, methods, paleoclimate analysis, and rejection of the consensus position. Of all the papers, 75% fell into the first three categories, either explicitly or implicitly accepting the consensus view; 25% dealt with methods or paleoclimate, taking no position on current anthropogenic climate change. Remarkably, none of the papers disagreed with the consensus position.

Admittedly, authors evaluating impacts, developing methods, or studying paleoclimatic change might believe that current climate change is natural. However, none of these papers argued that point.

This analysis shows that scientists publishing in the peer-reviewed literature agree with IPCC, the National Academy of Sciences, and the public statements of their professional societies. Politicians, economists, journalists, and others may have the impression of confusion, disagreement, or discord among climate scientists, but that impression is incorrect.

The scientific consensus might, of course, be wrong. If the history of science teaches anything, it is humility, and no one can be faulted for failing to act on what is not known. But our grandchildren will surely blame us if they find that we understood the reality of anthropogenic climate change and failed to do anything about it.

Many details about climate interactions are not well understood, and there are ample grounds for continued research to provide a better basis for understanding climate dynamics. The question of what to do about climate change is also still open. But there is a scientific consensus on the reality of anthropogenic climate change. Climate scientists have repeatedly tried to make this clear. It is time for the rest of us to listen.

### References and Notes
1. A. C. Revkin, K. Q. Seelye, *New York Times*, 19 June 2003, A1.
2. S. van den Hove, M. Le Menestrel, H.-C. de Bettignies, *Climate Policy* **2** (1), 3 (2003).
3. See www.ipcc.ch/about/about.htm.
4. J. J. McCarthy *et al.*, Eds., *Climate Change 2001: Impacts, Adaptation, and Vulnerability* (Cambridge Univ. Press, Cambridge, 2001).
5. National Academy of Sciences Committee on the Science of Climate Change, *Climate Change Science: An Analysis of Some Key Questions* (National Academy Press, Washington, DC, 2001).
6. American Meteorological Society, *Bull. Am. Meteorol. Soc.* **84**, 508 (2003).
7. American Geophysical Union, *Eos* **84** (51), 574 (2003).
8. See www.ourplanet.com/aaas/pages/atmos02.html.
9. The first year for which the database consistently published abstracts was 1993. Some abstracts were deleted from our analysis because, although the authors had put "climate change" in their key words, the paper was not about climate change.
10. This essay is excerpted from the 2004 George Sarton Memorial Lecture, "Consensus in science: How do we know we're not wrong," presented at the AAAS meeting on 13 February 2004. I am grateful to AAAS and the History of Science Society for their support of this lectureship; to my research assistants S. Luis and G. Law; and to D. C. Agnew, K. Belitz, J. R. Fleming, M. T. Greene, H. Leifert, and R. C. J. Somerville for helpful discussions.

The author is in the Department of History and Science Studies Program, University of California at San Diego, La Jolla, CA 92093, USA. E-mail: noreskes@ucsd.edu

10.1126/science.1103618

# ERRATUM

**Post date 21 January 2005**

**Essays:** "The scientific consensus on climate change" by N. Oreskes (3 Dec. 2004, p. 1686). The final sentence of the fifth paragraph should read "That hypothesis was tested by analyzing 928 abstracts, published in refereed scientific journals between 1993 and 2003, and listed in the ISI database with the keywords 'global climate change' (9)." The keywords used were "global climate change," not "climate change."

**EXHIBIT 5**

4 of 4 DOCUMENTS


The New York Times


June 8, 2005 Wednesday
Late Edition - Final


# BUSH AIDE EDITED CLIMATE REPORTS

**BYLINE:** By ANDREW C. REVKIN

**SECTION:** Section A; Column 2; National Desk; Pg. 1

**LENGTH:** 1291 words


A White House official who once led the oil industry's fight against limits on greenhouse gases has repeatedly edited government climate reports in ways that play down links between such emissions and global warming, according to internal documents.

In handwritten notes on drafts of several reports issued in 2002 and 2003, the official, Philip A. Cooney, removed or adjusted descriptions of climate research that government scientists and their supervisors, including some senior Bush administration officials, had already approved. In many cases, the changes appeared in the final reports.

The dozens of changes, while sometimes as subtle as the insertion of the phrase "significant and fundamental" before the word "uncertainties," tend to produce an air of doubt about findings that most climate experts say are robust.

Mr. Cooney is chief of staff for the White House Council on Environmental Quality, the office that helps devise and promote administration policies on environmental issues.

Before going to the White House in 2001, he was the "climate team leader" and a lobbyist at the American Petroleum Institute, the largest trade group representing the interests of the oil industry. A lawyer with a bachelor's degree in economics, he has no scientific training.

The documents were obtained by The New York Times from the Government Accountability Project, a nonprofit legal-assistance group for government whistle-blowers.

The project is representing Rick S. Piltz, who resigned in March as a senior associate in the office that coordinates government climate research. That office, now called the Climate Change Science Program, issued the documents that Mr. Cooney edited.

A White House spokeswoman, Michele St. Martin, said yesterday that Mr. Cooney would not be available to comment. "We don't put Phil Cooney on the record," Ms. St. Martin said. "He's not a cleared spokesman."

In one instance in an October 2002 draft of a regularly published summary of government climate research, "Our Changing Planet," Mr. Cooney amplified the sense of uncertainty by adding the word "extremely" to this sentence: "The attribution of the causes of biological and ecological changes to climate change or variability is extremely difficult."

In a section on the need for research into how warming might change water availability and flooding, he crossed out a paragraph describing the projected reduction of mountain glaciers and snowpack. His note in the margins explained that this was "straying from research strategy into speculative findings/musings."

Other White House officials said the changes made by Mr. Cooney were part of the normal interagency review that

http://w3.nexis.com/new/delivery/PrintDoc.do?fileSize=12574&job...

takes place on all documents related to global environmental change. Robert Hopkins, a spokesman for the White House Office of Science and Technology Policy, noted that one of the reports Mr. Cooney worked on, the administration's 10-year plan for climate research, was endorsed by the National Academy of Sciences. And Myron Ebell, who has long campaigned against limits on greenhouse gases as director of climate policy at the Competitive Enterprise Institute, a libertarian group, said such editing was necessary for "consistency" in meshing programs with policy.

But critics said that while all administrations routinely vetted government reports, scientific content in such reports should be reviewed by scientists. Climate experts and representatives of environmental groups, when shown examples of the revisions, said they illustrated the significant if largely invisible influence of Mr. Cooney and other White House officials with ties to energy industries that have long fought greenhouse-gas restrictions.

In a memorandum sent last week to the top officials dealing with climate change at a dozen agencies, Mr. Piltz said the White House editing and other actions threatened to taint the government's $1.8 billion-a-year effort to clarify the causes and consequences of climate change.

"Each administration has a policy position on climate change," Mr. Piltz wrote. "But I have not seen a situation like the one that has developed under this administration during the past four years, in which politicization by the White House has fed back directly into the science program in such a way as to undermine the credibility and integrity of the program."

A senior Environmental Protection Agency scientist who works on climate questions said the White House environmental council, where Mr. Cooney works, had offered valuable suggestions on reports from time to time. But the scientist, who spoke on the condition of anonymity because all agency employees are forbidden to speak with reporters without clearance, said the kinds of changes made by Mr. Cooney had damaged morale. "I have colleagues in other agencies who express the same view, that it has somewhat of a chilling effect and has created a sense of frustration," he said.

Efforts by the Bush administration to highlight uncertainties in science pointing to human-caused warming have put the United States at odds with other nations and with scientific groups at home.

Prime Minister Tony Blair of Britain, who met with President Bush at the White House yesterday, has been trying to persuade him to intensify United States efforts to curb greenhouse gases. Mr. Bush has called only for voluntary measures to slow growth in emissions through 2012.

Yesterday, saying their goal was to influence that meeting, the scientific academies of 11 countries, including those of the United States and Britain, released a joint letter saying, "The scientific understanding of climate change is now sufficiently clear to justify nations taking prompt action."

The American Petroleum Institute, where Mr. Cooney worked before going to the White House, has long taken a sharply different view. Starting with the negotiations leading to the Kyoto Protocol climate treaty in 1997, it has promoted the idea that lingering uncertainties in climate science justify delaying restrictions on emissions of carbon dioxide and other heat-trapping smokestack and tailpipe gases.

On learning of the White House revisions, representatives of some environmental groups said the effort to amplify uncertainties in the science was clearly intended to delay consideration of curbs on the gases, which remain an unavoidable byproduct of burning oil and coal.

"They've got three more years, and the only way to control this issue and do nothing about it is to muddy the science," said Eileen Claussen, the president of the Pew Center on Global Climate Change, a private group that has enlisted businesses in programs cutting emissions.

Mr. Cooney's alterations can cause clear shifts in meaning. For example, a sentence in the October 2002 draft of "Our Changing Planet" originally read, "Many scientific observations indicate that the Earth is undergoing a period of relatively rapid change." In a neat, compact hand, Mr. Cooney modified the sentence to read, "Many scientific observations point to the conclusion that the Earth may be undergoing a period of relatively rapid change."

A document showing a similar pattern of changes is the 2003 "Strategic Plan for the United States Climate Change Science Program," a thick report describing the reorganization of government climate research that was requested by Mr. Bush in his first speech on the issue, in June 2001. The document was reviewed by an expert panel assembled in 2003 by

the National Academy of Sciences. The scientists largely endorsed the administration's research plan, but they warned that the administration's procedures for vetting reports on climate could result in excessive political interference with science.

**URL:** http://www.nytimes.com

**LOAD-DATE:** June 8, 2005

**LANGUAGE:** ENGLISH

**GRAPHIC:** Chart: "An Editor in the White House"Handwritten revisions and comments by Philip A. Cooney, chief of staff for the White House Council on Environmental Quality, appear on two draft reports by the Climate Change Science Program and the Subcommittee on Global Change Research. Mr. Cooneys changes were incorporated into later versions of each document, shown below with revisions in bold.Chart shows:'STRATEGIC PLAN FOR THE U.S. CLIMATE CHANGE SCIENCE PROGRAM, DRAFT TEXT, OCT. 2002'PUBLIC REVIEW DRAFT, NOV. 2002Warming could also lead to changes in the water cycle in polar regions. Reducing the uncertainties . . .FINAL REPORT, JULY 2003The paragraph does not appear in the final report.'OUR CHANGING PLANET, DRAFT TEXT, OCT. 2002'FINAL REPORT, 2003The challenge for the USGCRP is to provide the best possible scientific basis for documenting, understanding, and projecting changes in the Earth's life-support systems, and the role for CCRI is to reduce the significant remaining uncertainties associated with human-induced climate change and facilitate full use of scientific information in policy and decisionmaking on possible response strategies for adaptation and mitigation.(pg. A15)

**PUBLICATION-TYPE:** Newspaper

Copyright 2005 The New York Times Company

**EXHIBIT 6**

1 of 2 DOCUMENTS

CBS News Transcripts

July 30, 2006 Sunday

**SHOW:** 60 Minutes 7:00 PM EST CBS

# Rewriting The Science: Government scientists working on environmental issues don't believe the truth is being told about dangers of global warming

**ANCHORS:** SCOTT PELLEY

**LENGTH:** 1958 words

REWRITING THE SCIENCE

SCOTT PELLEY, co-host:

As a government scientist, James Hansen is taking a risk. He says there are things the White House doesn't want you to hear, but he's going to say them anyway. Hansen is arguably the world's leading researcher on global warming. He's the head of NASA's top institute studying the climate. But, as we first reported last spring, this eminent scientist says the Bush administration is restricting who he can talk to and editing what he can say. Politicians, he says, are rewriting the science. Well, there'll be none of that tonight because James Hansen is telling what he knows on 60 MINUTES.

You believe that the administration is censoring what you can say to the public?

Mr. JAMES HANSEN: Well, they're censoring whether or not I can say it. I mean, I say what I believe if I'm allowed to say it.

(Footage of glaciers; penguins; sea lions)

PELLEY: (Voiceover) What James Hansen believes is that global warming is accelerating. He points to the melting Arctic and to Antarctica, where new data show massive losses of ice to the sea.

Is it fair to say at this point that humans control the climate? Is that possible?

Mr. HANSEN: There's no doubt about that. The natural changes, the speed of the natural changes is now dwarfed by the changes that humans are making to the atmosphere and to the surface.

(Footage of clouds of smoke being emitted from building; glacial ice; penguins; glacial ice)

PELLEY: (Voiceover) Those human changes, he says, are driving by burning fossil fuels which pump out greenhouse gases like CO2, carbon dioxide. Hansen says that his research shows man has just 10 years to begin to reduce greenhouse gas emissions or global warming will reach what he calls "a tipping point" and will become unstoppable. He says the White House is blocking that message.

Mr. HANSEN: In my more than three decades in the government, I've never witnesses such restrictions on the ability of scientists to communicate with the public.

(Footage of e-mail with quote highlighted; Hansen speaking to group; Pelley speaking to Ralph Cicerone)

PELLEY: (Voiceover) Restrictions like this e-mail, which Hansen's institute received from NASA in 2004. "There is a new review process. The White House [is] now reviewing all climate related press releases."

Why the scrutiny of Hansen's work? Well, his Goddard Institute of Space Studies is the source of respected but sobering research on warming. It recently announced 2005 was the warmest year on record. Hansen started at NASA more than 30 years ago and spent nearly all of that time studying the earth. How important is his work? We asked someone at the top, Ralph Cicerone, president of the nation's leading institute of science, the National Academy of Sciences.

Mr. RALPH CICERONE: I can't think of anybody who I would say is better than Hansen. You might argue that there's two or three others as good, but nobody better.

(Footage of Pelley speaking with Cicerone)

PELLEY: (Voiceover) And Cicerone, who's an atmospheric chemist, said the same thing that every leading scientist told us.

Mr. CICERONE: Climate change is really happening.

PELLEY: So what is causing the changes?

Mr. CICERONE: Well, the greenhouse gases, carbon dioxide and methane and chlorofluorocarbons and a couple of others, which are all--the increases in their concentrations in the air are due to human activities. It's that simple.

(Footage of report; Bush and Cheney)

PELLEY: (Voiceover) But if it is that simple, why do climate science reports look like this after they've been edited at the White House, with science labeled "not sufficiently reliable"? It's a tone of scientific uncertainty that the president set in his first months in office after he pulled out of a treaty to reduce global greenhouse gas emissions.

President GEORGE W. BUSH: We do not know how much our climate could or will change in the future. We do not know how fast change will occur, or even how some of our actions could impact it.

(Footage of Hansen and colleagues working)

PELLEY: (Voiceover) That ambiguity annoyed Hansen, so he went public near two years ago, saying this about the Bush administration in a talk at the University of Iowa.

Mr. HANSEN: I find a willingness to listen only to those portions of scientific results that fit predetermined, inflexible positions. This, I believe, is a recipe for environmental disasters.

(Footage of Pelley interviewing Hansen with woman sitting in)

PELLEY: (Voiceover) Ever since he said that, NASA's been keeping an eye on Hansen. NASA let us sit down with him, but only with a NASA representative taping the interview. Other interviews have been denied.

Mr. HANSEN: And I object to the fact that I'm not able to freely communicate via the media. National Public Radio wanted to interview me and they were told that they would need to instead interview someone at NASA headquarters. And the comment was made that they didn't want Jim Hansen going on the most liberal media in the nation. So I don't think that kind of decision should be made on that kind of basis. I think we should be able to communicate the science.

(Footage of Pelley speaking with Hansen; Bill Clinton)

PELLEY: (Voiceover) Politically, Hansen calls himself an independent, and he's had trouble with both parties. He says from time to time, the Clinton administration wanted to hear that warming was worse that it was, but Hansen refused to spin the science that way.

Mr. HANSEN: Should we be simply doing our science and reporting it rigorously or to what degree the administration in power has the right to assume that you're--should be a spokesman for the administration? I tried to be a straight scientist,

http://w3.nexis.com/new/delivery/PrintDoc.do?fileSize=17302&job...

doing the science and reporting it as best I can.

(Footage of White House; edited climate report; Pelley speaking with Rick Piltz)

PELLEY: (Voiceover) Dozens of federal agencies report science, and much of it is edited at the White House before it's sent to Congress and the public. It appears that climate science is edited with a heavy hand. These drafts of climate reports were co-written by Rick Piltz for the Federal Climate Change Science program. But Piltz says his work was edited by the White House to make global warming seem less threatening.

Mr. RICK PILTZ: The strategy of people with their political agenda to avoid this issue is to say, `There's so much to study way upstream here that we can't even begin to discuss impacts and response strategies. There's much too much uncertainty.' And it's not climate scientists who are saying that, it's lawyers, it's politicians.

(Footage of Piltz at an event; photo of Piltz at his desk; report)

PELLEY: (Voiceover) Piltz worked under the Clinton and Bush administrations. And each year, he helped write a report to Congress called Our Changing Planet.

You're responsible for editing Our Changing Planet, and you send a review draft to the White House. What happens?

Mr. PILTZ: It comes back with a large number of edits handwritten on the hard copy by the chief of staff of the Council on Environmental Quality.

PELLEY: And the chief of staff is whom?

Mr. PILTZ: Phil Cooney.

PELLEY: He's a scientist?

Mr. PILTZ: No, he's a lawyer. He was a lobbyist for the American Petroleum Institute before going into the White House.

(Footage of White House; edited report)

PELLEY: (Voiceover) Phil Cooney, the former oil industry lobbyist, became chief of staff at the White House Council on Environmental Quality. Piltz says Cooney edited climate reports in his own hand. Here, a line that said Earth is undergoing rapid change becomes "may be undergoing change." "Uncertainty" becomes "significant remaining uncertainty." This line that says "energy production contributes to warming" is just crossed out.

Mr. PILTZ: He was obviously passing it through a political screen. He would put in the world "potential" or "may" or "weaken" or delete text if it had to do with the likely consequences of climate change.

(Footage of edited report; Pelley interviewing Piltz)

PELLEY: (Voiceover) Here, Piltz says that Cooney added this line: "The uncertainties remain so great as to preclude meaningfully informed decision making." References to human health are marked out. We obtained the drafts from the Government Accountability Project. The edits you're seeing made it into the final report. Here's that phrase, "Earth may be undergoing change" in the report to Congress. Piltz says there wasn't room at the White House for those who disagreed, so he resigned.

Mr. PILTZ: I mean, even to raise issues internally is immediately career limiting. That's why you will find not too many people in the federal agencies who will speak freely about all the things they know, unless they're retired or unless they're ready to resign.

(Footage of Hansen working in his office; helicopter flying over icy landscape)

PELLEY: (Voiceover) Jim Hansen isn't retiring or resigning because he believes Earth is nearing a point of no return. He urges to look north, to the Arctic, where temperatures are rising twice as fast as the rest of the world. We saw for

ourselves the accelerating melt of the largest ice sheet in the north.

Here in Greenland, about 15 years ago, the ice sheet extended to right about where I'm standing now. Today, it's back there, between those hills in that shaded area. Glaciologists call this a melt stream, but these days, it's more like a melt river.

(Footage of helicopter; man setting up equipment in Arctic)

PELLEY: (Voiceover) The Bush administration doesn't deny global warming or that man plays a role. The administration is spending billions of dollars on climate research. Hansen gives the White House credit for the research but he says what's urgent now is action.

Mr. HANSEN: We have to, in the next 10 years, get off of this exponential curve and begin to decrease the rate of growth of CO2 emissions, and then flatten it out. And before we get to the middle of the century, we've got to be on a declining curve.

PELLEY: And if that doesn't start within 10 years, what happens?

Mr. HANSEN: If that doesn't start within 10 years then I don't think we can keep global warming, additional global warming under one degree Celsius. And that means we're going to--that there's a great danger of passing some of these tipping points. If the ice sheets once begin to disintegrate, what can you do about it? You can't tie a rope around the ice sheet, you can't build a wall around the ice sheets. It will be a situation that is out of our control.

(Footage of edited report; Hansen speaking to a group)

PELLEY: (Voiceover) But it's not a situation you'll find in this federal report. Government scientists wanted to tell you about the ice sheets, but before this draft left the White House, the paragraph on glacial melt and flooding was crossed out and this was added: "straying from research strategy into speculative findings and musings here." Hansen says that kind of editing happened to him once during a presentation, when a top official scolded him for using the word "danger."

Mr. HANSEN: I think we know a lot more about tipping points. I think we know about the dangers of even a moderate degree of additional global warming, about the potential effects in the Arctic, about the potential effects on the ice sheets.

PELLEY: You just used that word again that you're not supposed to use: "danger."

Mr. HANSEN: Yeah. It is a danger.

PELLEY: We wanted to speak with the president's science adviser, John Marberger, but after making requests to his office over several months, his director of communications, Don Teague, told us that Marberger would never be available. Two weeks after our story first aired, NASA adopted a new communications policy; the agency says scientists can now speak out as long as they label their opinions as their own.

(Announcements)

**LOAD-DATE:** July 31, 2006

**LANGUAGE:** ENGLISH

**DOCUMENT-TYPE:** Profile

**PUBLICATION-TYPE:** Transcript

Copyright 2006 CBS Worldwide Inc.
All Rights Reserved

**EXHIBIT 7**

HENRY A. WAXMAN, CALIFORNIA
CHAIRMAN

TOM DAVIS, VIRGINIA
RANKING MINORITY MEMBER

ONE HUNDRED TENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

Majority (202) 225–5051
Minority (202) 225–5074

**MEMORANDUM**

**January 30, 2007**

To:    **Members of the Committee on Oversight and Government Reform**

From: **Chairman Henry A. Waxman**

Re:    **CEQ Documents**

This memorandum provides additional information about the documents from the White House Council on Environmental Quality being sought by the Committee.

We know from an *in camera* review of a subset of the documents the Committee is seeking that the White House possesses documents that appear to provide evidence that White House and other Administration officials attempted to inject doubt into conclusions reached by the Environmental Protection Agency about the significance of global warming. The limited subset of documents reviewed by Committee staff indicate that Administration officials sought to edit an EPA report (1) to add "balance" by emphasizing the "beneficial effects" of climate change, (2) to delete a discussion of the human health and environmental effects of climate change, (3) to strike any discussion of atmospheric concentrations of carbon because carbon levels are not a "good indicator of climate change," and (4) to remove the statement that "changes observed over the last several decades are likely mostly the result of human activities." Some of the most questionable edits were urged by Phillip Cooney, a former lobbyist for the American Petroleum Institute who served as chief of staff at the CEQ.

## I.    BACKGROUND

There have been a number of allegations of political interference by Administration officials in the work of government climate change scientists. In some cases, the allegations have directly implicated your office. Beginning over six months ago, on July 20, 2006, the Committee sought to evaluate these allegations by requesting documents from CEQ related to (1) Mr. Cooney's activities on global warming; (2) CEQ attempts to edit scientific reports on global

warming; (3) CEQ communications with other federal agencies regarding climate change science; (4) CEQ efforts to manage or influence the statements about global warming made by government scientists; and (5) contacts between CEQ and any nongovernmental party related to climate change.[1]

Over the past six months, we have had numerous communications with CEQ about this document request. The Committee initially requested that the documents be provided by August 11, 2006.[2] This deadline was extended to October 2, 2006,[3] and subsequently to October 23, 2006.[4] During this process, CEQ has accommodated the Committee's requests for copies of redacted documents that were previously released under the Freedom of Information Act. But with the exception of fewer than ten documents provided to the Committee yesterday evening, CEQ has refused to produce nonpublic documents to the Committee.

To date, we have made considerable concessions to CEQ to ease compliance with the Committee's request. On August 17, 2006, the Committee agreed to limit the timeframe covered by the request.[5] On August 29, 2006, the Committee agreed to limit the scope of our request to only seven CEQ staff members and officials.[6] On September 20, 2006, we further narrowed the request by eliminating two out of five criteria for documents to be produced from our original July 20, 2006, request.[7] These reductions in scope are significant and have reduced the scope of our request to the minimum necessary to fulfill our oversight responsibilities.

Most recently, the Committee requested that unredacted copies of 39 specific documents be provided by close of business last Thursday, January 25, 2007.[8] These documents were

---

[1] Letter from Chairman Tom Davis and Rep. Henry A. Waxman to James Connaughton, Chairman, Council on Environmental Quality (July 20, 2006).

[2] *Id.*

[3] Email from Jennifer Safavian, Chief Counsel for Oversight and Investigations, House Government Reform Committee, to Ted Boling and Ashley Cohen, Council on Environmental Quality (Aug. 29, 2006).

[4] Letter from Chairman Tom Davis and Rep. Henry A. Waxman to James Connaughton, Chairman, Council on Environmental Quality (Sept. 20, 2006).

[5] Meeting between House Government Reform Committee staff and Council on Environmental Quality staff (Aug.17, 2006).

[6] Email from Jennifer Safavian, Chief Counsel for Oversight and Investigations, House Government Reform Committee, to Ted Boling and Ashley Cohen, Council on Environmental Quality (Aug. 29, 2006).

[7] Letter from Chairman Tom Davis and Rep. Henry A. Waxman to James Connaughton, Chairman, Council on Environmental Quality (Sept. 20, 2006).

[8] Letter from Chairman Henry A. Waxman and Rep. Tom Davis, Chairman, Council on Environmental Quality (Jan. 22, 2007).

specifically identified by reference number and are easily accessible to CEQ staff. Discussions between our staffs indicate that these documents have already been pulled from their files and are ready to be delivered to the Committee. In a letter sent yesterday evening, however, the White House indicated that it would produce only nine of these documents to the Committee.[9]

## II.    THE SIGNIFICANCE OF THE DOCUMENTS

On October 20, October 27, and November 17, 2006, the Committee staff was permitted to conduct an *in camera* review at CEQ offices of a select subset of the documents the Committee had requested. The documents viewed by the Committee staff comprise only a small part of the information requested by the Committee. These documents did not include, for example, over 10,000 email records that CEQ has identified as potentially responsive to the Committee's request.[10] A review of the full set of responsive documents is necessary for the Committee to reach accurate conclusions about the role played by CEQ and other Administration officials.

Nonetheless, the limited review conducted by the Committee staff confirmed that CEQ possesses — and has failed to produce to the Committee — documents of direct relevance to the Committee's inquiry. According to the notes taken by the staff who reviewed the documents, the White House has documents that appear to contain evidence of a vigorous effort by senior Administration officials to downplay the certainty and negative impacts of global warming.

Many of the documents reviewed by the Committee staff involved White House and interagency review during 2003 of a draft EPA document entitled *Report on the Environment*. This draft report contained a discussion of the dangers global warming posed for human health and the environment. The release of EPA's conclusions would have put the Administration on record as recognizing the prevailing scientific consensus on global warming. This would have been a significant milestone in the public debate about global warming.

The documents provide evidence, however, that White House and agency officials repeatedly pushed to undermine EPA's scientific conclusions about global warming during the review process. The Office of Management and Budget commented that EPA's climate change section "needs balance. Global climate change has beneficial effects as well as adverse impacts."[11] OMB also suggested striking a discussion of climate change from the executive

---

[9] Letter from James Connaughton, Chairman, Council on Environmental Quality, to Chairman Henry A. Waxman and Rep. Tom Davis (Jan. 29, 2007).

[10] *Id.*

[11] Committee Staff Notes, Document Numbered ARMS 16, Attachment 1 (EPA Draft Report on the Environment).

summary.[12]  The White House Office of Science and Technology Policy urged deletion of a discussion of the human health and ecological effects of climate change.[13]  One CEQ staffer urged EPA to "delete climate change or use previously agreed upon material."[14]  The Department of Energy argued through the White House that EPA should strike any discussion of atmospheric concentrations of carbon, arguing that it was not a "good indicator of climate change."[15]

Another Administration commenter cautioned:  "Take care here and be sure to be consistent with existing administration policy.  Let us try to avoid another CAR scenario."[16]  This was a reference to the Climate Action Report (CAR) prepared by the U.S. State Department, which had concluded that human activities are "causing global mean surface air temperature and subsurface ocean temperature to rise."[17]  President Bush had distanced himself from the Climate Action Report by referring to it as "the report put out by the bureaucracy."[18]

There are many examples in the documents of edits requested by the White House that seem to minimize the impacts of climate change or inject unjustified doubt into the issue.  One OMB set of edits contains many deletions from the EPA text, including a deletion of a reference to the fact that climate change may "alter regional patterns of climate" and "potentially affect the balance of radiation."[19]  Other edits deleted the phrase "changes observed over the last several decades are likely mostly the result of human activities" and replaced it with the phrase "a causal link between the buildup of greenhouse gases in the atmosphere and the observed climate changes during the 20th century cannot be unequivocally established."[20]

---

[12] Committee Staff Notes, Document Numbered WH 19 (EPA Draft Report on the Environment).

[13] Committee Staff Notes, Document Numbered ARMS 23, Attachment 1 (EPA Draft Report on the Environment).

[14] Committee Staff Notes, Document Numbered ARMS 34 (EPA Draft Report on the Environment).

[15] Committee Staff Notes, Document Numbered ARMS 39, Attachment 5 (EPA Draft Report on the Environment).

[16] Committee Staff Notes, Document Numbered ARMS 39, Attachment 18 (EPA Draft Report on the Environment).

[17] U.S. State Department, *U.S. Climate Action Report* (2002).

[18] *President Distances Himself From Global Warming Report*, New York Times (June 5, 2002).

[19] Committee Staff Notes, Document Numbered ARMS 69, Attachment 2 (EPA Draft Report on the Environment).

[20] Committee Staff Notes, Document Numbered WH 15 (EPA Draft Report on the Environment).

4

Among the documents reviewed *in camera* were copies of some handwritten notes by Phillip Cooney, who was the CEQ chief of staff. Although Mr. Cooney was a former oil industry lobbyist, not a scientist, he made several technical scientific changes to the draft report. He inserted the claim that satellite data disputes global warming,[21] and he deleted the statement that "regional patterns may be altered" by climate change.[22]

Mr. Cooney also struck climate change from a discussion of environmental issues that have global consequences,[23] deleted a chart depicting historical temperature reconstruction,[24] and inserted the word "potentially" in several places to reduce the certainty of scientific statements regarding the impacts of climate change.[25] Another set of Mr. Cooney's edits deleted the phrase "climate change has global consequences for human health and the environment,"[26] struck a reference to the observation that the warmest eight years on record have occurred between 1990 and 2001,[27] and excised a reference to the National Research Council's finding that human activities are causing temperatures to rise.[28]

One note from Mr. Cooney directed, "these changes must be made."[29]

In another document, Mr. Cooney informs Kevin O'Donovan in the Executive Office of the President that CEQ will start to use a paper by Willie Soon and Sally Baliunas to rebut the views of the National Academy of Sciences and Intergovernmental Panel on Climate Change and assert that the 20th century is probably not the warmest nor a uniquely extreme climatic period of the last millennium. In the document, Mr. Cooney states that he has put a reference to this paper

---

[21] Committee Staff Notes, Document Numbered WH 6 (EPA Draft Report on the Environment).

[22] Committee Staff Notes, Document Numbered WH 6 (EPA Draft Report on the Environment).

[23] Committee Staff Notes, Document Numbered WH 6 (EPA Draft Report on the Environment).

[24] Committee Staff Notes, Document Numbered WH 6 (EPA Draft Report on the Environment).

[25] Committee Staff Notes, Document Numbered WH 6 (EPA Draft Report on the Environment).

[26] Committee Staff Notes, Document Numbered WH 5 (EPA Draft Report on the Environment).

[27] Committee Staff Notes, Document Numbered WH 5 (EPA Draft Report on the Environment).

[28] Committee Staff Notes, Document Numbered WH 5 (EPA Draft Report on the Environment).

[29] Committee Staff Notes, Document Numbered WH 6 (EPA Draft Report on the Environment).

into EPA's draft report.[30]  The Soon-Baliunas paper was the focus of considerable criticism.  It had been funded by the American Petroleum Institute and the editor-in-chief of the journal that published the paper resigned in its aftermath, believing the paper was fundamentally flawed and never should have been published.[31]

One email indicates that CEQ Chairman James Connaughton was personally involved in the review of the EPA report.  In this email, Mr. Connaughton requested to know every edit made to the EPA draft report and whether EPA was able to accept the edit or suggest an alternative.[32]

These edits resulted in an EPA memo in June 2003, in which EPA staff described three options from which the EPA Administrator could choose.  Option 1 was for the EPA Administrator to accept the CEQ and OMB edits.  While EPA staff noted this was the "easiest" course of action, they also cautioned that "EPA will take responsibility and severe criticism from the science and environmental community for poorly representing the science."[33]  The EPA staff warned that the edited report "undercuts" the National Research Council and the Intergovernmental Panel on Climate Change.[34]  According to the EPA staff, the edited report "provides specific text to attack" and creates the "potential to extend the period of criticism."[35]

The second option that EPA staff outlined for the EPA Administrator was to remove the climate change section entirely from the report.  The benefits of this approach, according to EPA staff, were that it would provide "little content for attacks on EPA's science" and it "may be the only way to meet both WH and EPA needs."[36]  EPA staff expressed concern that "EPA will take criticism for omitting climate change" from the report.[37]

----

[30] Committee Staff Notes, Document Numbered WH 18 (EPA Draft Report on the Environment).

[31] *Three Journal Editors Resign Over Paper by Skeptics, Journal Editors Resign in Protect Over Flaws in Paper by Skeptics*, Cox News Service (July 29, 2003).

[32] Committee Staff Notes, Document Numbered ARMS 34 (EPA Draft Report on the Environment).

[33] Committee Staff Notes, Document Numbered WH 22 (EPA Draft Report on the Environment).

[34] Committee Staff Notes, Document Numbered WH 22 (EPA Draft Report on the Environment).

[35] Committee Staff Notes, Document Numbered WH 22 (EPA Draft Report on the Environment).

[36] Committee Staff Notes, Document Numbered WH 22 (EPA Draft Report on the Environment).

[37] Committee Staff Notes, Document Numbered WH 22 (EPA Draft Report on the Environment).

Finally, EPA staff described a third option for consideration. The EPA Administrator could refuse to accept the White House's "no further changes" direction and try to reach compromise.[38] EPA staff seemed to prefer this approach, stating that it was the "only approach that could produce a credible climate change section" in the *Report on the Environment*.[39] However, they warned, this course of action could "antagonize the White House" and "it is likely not feasible to negotiate agreeable text."[40]

In the end, EPA elected option 2 and deleted discussion of climate change from the report.[41]

The majority of documents reviewed by Committee staff related to the draft EPA report. But other documents reviewed by the staff suggested that White House officials acted in other contexts in ways that impeded public understanding of the threat of climate change. Some of the documents Committee staff reviewed involved the development of the Administration's Asia-Pacific Partnership on Clean Development and Climate. At least one of these documents alludes to the goal of superseding the mandatory reductions in global warming gases prescribed under the Kyoto Protocol with voluntary pollution reductions.[42]

In addition, documents independently obtained by the Committee provide evidence that the White House sought to oversee the statements made by federal climate change scientists to the media. According to a set of internal emails from the National Oceanographic and Atmospheric Administration, CEQ approved and monitored press interviews for specific climate change scientists in 2005. In these email exchanges, CEQ and the White House Office of Science and Technology Policy gave the "green light" for a media interview with a NOAA scientist, but required NOAA staff to "monitor the call and report back."[43]

---

[38] Committee Staff Notes, Document Numbered WH 22 (EPA Draft Report on the Environment).

[39] Committee Staff Notes, Document Numbered WH 22 (EPA Draft Report on the Environment).

[40] Committee Staff Notes, Document Numbered WH 22 (EPA Draft Report on the Environment).

[41] *Report by EPA Leaves Out Data on Climate Change*, New York Times (June 19, 2003).

[42] Committee Staff Notes, Document Numbered CEQ 35 (Asia-Pacific Partnership).

[43] Email from Jana Goldman to Kent Laborde (11:09 a.m., June 13, 2005); Email from Jana Goldman to Kent Laborde (1:05 p.m., June 13, 2005).

## III.    CONCLUSION

Many experts regard global warming as the most significant environmental threat facing the nation and the world.  The challenges of confronting global warming are immense, with potentially enormous health, environmental, and economic consequences.  For these reasons, both Congress and the American public need access to the best possible science from federal agencies to understand the nature of the problem and to assess appropriate policy responses.  It would be a serious matter if any Administration officials, particularly officials in the White House, sought to manipulate the science of global warming or to otherwise mislead Congress or the public about the magnitude of potential threat.

The documents the Committee has requested are essential to our investigation into this issue.  Even the limited subset of documents that the staff have reviewed raise serious questions about the actions of CEQ staff and others in the White House.  Both these documents and the others we have requested should be provided to the Committee without further delay.

**EXHIBIT 8**

TOM DAVIS, VIRGINIA,
CHAIRMAN

CHRISTOPHER SHAYS, CONNECTICUT
DAN BURTON, INDIANA
ILEANA ROS-LEHTINEN, FLORIDA
JOHN M. McHUGH, NEW YORK
JOHN L. MICA, FLORIDA
GIL GUTKNECHT, MINNESOTA
MARK E. SOUDER, INDIANA
STEVEN C. LATOURETTE, OHIO
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
CANDICE MILLER, MICHIGAN
MICHAEL R. TURNER, OHIO
DARRELL ISSA, CALIFORNIA
JON C. PORTER, NEVADA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
CHARLES W. DENT, PENNSYLVANIA
VIRGINIA FOXX, NORTH CAROLINA
JEAN SCHMIDT, OHIO
BRIAN P. BILBRAY, CALIFORNIA

ONE HUNDRED NINTH CONGRESS

# Congress of the United States

## House of Representatives

**COMMITTEE ON GOVERNMENT REFORM**

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY   (202) 225–5074
FACSIMILE  (202) 225–3974
MINORITY   (202) 225–5051
TTY        (202) 225–6852

http://reform.house.gov

HENRY A. WAXMAN, CALIFORNIA,
RANKING MINORITY MEMBER

TOM LANTOS, CALIFORNIA
MAJOR R. OWENS, NEW YORK
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
CHRIS VAN HOLLEN, MARYLAND
LINDA T. SANCHEZ, CALIFORNIA
C.A. DUTCH RUPPERSBERGER,
   MARYLAND
BRIAN HIGGINS, NEW YORK
ELEANOR HOLMES NORTON,
   DISTRICT OF COLUMBIA

BERNARD SANDERS, VERMONT,
INDEPENDENT

July 20, 2006

Mr. James L. Connaughton
Chairman
Council on Environmental Quality
722 Jackson Place, NW
Washington, DC 20503

Dear Chairman Connaughton:

Thank you for your participation in the hearing on climate change. We have some additional questions regarding the Administration's activities relating to climate change that were not explored at the hearing, and we would like your assistance in obtaining certain documents related to these activities.

Specifically, we are interested in documents that would shed light on interactions between the Council on Environmental Quality and other government agencies and outside parties relating to the Administration's position and public communications on climate science. Among other issues, there has been substantial controversy regarding the actions of the former chief of staff for CEQ, Phillip Cooney. Mr. Cooney, who is not a scientist, was reported to have been active in editing scientific reports on global warming produced by other government agencies.

We request that you provide to the Committee all communications and other documents relating to:

(1)     Mr. Cooney's activities related to climate change;

(2)     CEQ's review of and suggested edits to materials produced by other federal agencies regarding climate change;

(3)     Efforts by CEQ to manage or influence statements made by government scientists or experts to representatives of media regarding climate change;

(4)     CEQ's communications with other federal agencies regarding climate change science; and

The Honorable James Connaughton
July 20, 2006
2

(5)    Contacts between CEQ and any nongovernmental party related to climate change.

This request does not encompass documents that CEQ has previously made publicly available.  Please provide the requested documents by August 11, 2006.

Thank you for your assistance in this matter.

Sincerely,

Tom Davis
Chairman

Henry A. Waxman
Ranking Member

**EXHIBIT 9**

HENRY A. WAXMAN, CALIFORNIA
CHAIRMAN

TOM DAVIS, VIRGINIA
RANKING MINORITY MEMBER

ONE HUNDRED TENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 Rayburn House Office Building

Washington, DC 20515–6143

Majority (202) 225–5051
Minority (202) 225–5074

January 22, 2007

Mr. James L. Connaughton
Chairman
Council on Environmental Quality
722 Jackson Place, NW
Washington, DC 20503

Dear Mr. Chairman:

Last Congress, we initiated an investigation into allegations that officials on the White House Council of Environmental Quality edited scientific reports and took other actions to minimize the significance of global warming. We are writing to let you know that the Oversight Committee will continue this investigation this Congress and to request your continued assistance.

Last October and November, Committee staff reviewed some CEQ documents at the White House. Several of these documents appear to contain information that is relevant to a hearing the Committee will be holding on January 30. We therefore ask that you provide the Committee with unredacted copies of the documents listed in Appendix A by the close of business on Thursday, January 25.

We have also determined that the process of reviewing responsive documents at the CEQ offices, which the Committee tried last year, will not be workable this Congress. Consequently, we request that you provide a full set of responsive documents to the Committee by February 9, 2007. As you will recall, the Committee's document request, as modified as a result of discussions with your staff, encompasses all communications and other documents that (1) were sent to or generated by, reference, or are in the electronic or paper files of any of the following individuals: James L. Connaughton, Phillip Cooney, Bryan Hannegan, Marty Hall, Kenneth L. Peel, Bill Holbrook, or Michele St. Martin; and that (2) relate to:

(a)    Mr. Cooney's activities related to climate change;
(b)    CEQ's review of and suggested edits to materials produced by other federal agencies regarding climate change; and

Mr. James L. Connaughton
January 22, 2007
Page 2

(c)     Efforts by CEQ to manage or influence statements made by government scientists
        or experts to representatives of media regarding climate change.

In addition, we respectfully renew the Committee's August 2006 request for an
organizational chart of CEQ and request that it also be provided by February 9.  This
organizational chart should identify current CEQ staff as well as all of their predecessors since
February 2001.  Please include the timeframe of employment for each current and former staff
member.

The Committee on Oversight and Government Reform is the principal oversight
committee in the House of Representatives and has broad oversight jurisdiction as set forth in
House Rule X, clauses 1(m), 2, 3(i), and 4(c).  An attachment to this letter provides additional
information to assist you in responding to the Committee's request.

If you have any questions regarding this request, please contact Greg Dotson of the
Committee staff at (202) 225-4407.

Sincerely,

Henry A. Waxman                              Tom Davis
Chairman                                     Ranking Minority Member

Enclosure

## Appendix A

ARMS 16 ATT 1, EPA Draft Report on the Environment
ARMS 23 ATT 1, EPA Draft Report on the Environment
ARMS 34, EPA Draft Report on the Environment
ARMS 39 ATT 5, EPA Draft Report on the Environment
ARMS 39 ATT 18, EPA Draft Report on the Environment
ARMS 69 ATT 2, EPA Draft Report on the Environment
ARMS 192, Climate Action Report
ARMS 243, Climate Action Report
ARMS 245, Climate Action Report
ARMS 254, Climate Action Report
ARMS 255, Climate Action Report
ARMS 274, Climate Action Report
ARMS 279, Climate Action Report
ARMS 286, Climate Action Report
ARMS 347, Climate Action Report
ARMS 357, Climate Action Report
ARMS 368, Climate Action Report
CEQ 2, Asia-Pacific Partnership
CEQ 3, Asia-Pacific Partnership
CEQ 4, Asia-Pacific Partnership
CEQ 8, Asia-Pacific Partnership
CEQ 15, U.S. Climate Change Science Program
CEQ 19, Asia-Pacific Partnership
CEQ 24, Asia-Pacific Partnership
CEQ 27, Asia-Pacific Partnership
CEQ 35, Asia-Pacific Partnership
CEQ 88, Asia-Pacific Partnership
CEQ 166, Asia-Pacific Partnership
CEQ 197, Asia-Pacific Partnership
HC 7, Climate Action Report
HC 61, Climate Action Report
WH 5, EPA Draft Report on the Environment
WH 4, EPA Draft Report on the Environment
WH 6, EPA Draft Report on the Environment
WH 8, EPA Draft Report on the Environment
WH 15, EPA Draft Report on the Environment
WH 18, EPA Draft Report on the Environment
WH 19, EPA Draft Report on the Environment
WH 22, EPA Draft Report on the Environment

HENRY A. WAXMAN, CALIFORNIA
CHAIRMAN

TOM DAVIS, VIRGINIA
RANKING MINORITY MEMBER

ONE HUNDRED TENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 Rayburn House Office Building

Washington, DC 20515–6143

Majority (202) 225–5051
Minority (202) 225–5074

### Responding to Oversight Committee Document Requests

In responding to the document request from the Committee on Oversight and Government Reform, please apply the instructions and definitions set forth below.

Instructions

1. In complying with the request, you should produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. You should also produce documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party. Records, documents, data, or information called for by this request should not be destroyed, modified, removed, transferred, or otherwise made inaccessible to the Committee.

2. In the event that any entity, organization, or individual denoted in this request has been, or is currently, known by any other name than that herein denoted, the request should be read also to include them under that alternative identification.

3. Each document produced should be produced in a form that renders the document capable of being copied.

4. When you produce documents, you should identify to which paragraph in the Committee's request the documents respond.

5. Documents produced in response to this request should be produced together with copies of file labels, dividers or identifying markers with which they were associated when this request was issued. To the extent that documents were not stored with file labels, dividers, or identifying markers, they should be organized into separate folders by subject matter prior to production.

6. Each folder and box should be numbered, and a description of the contents of each folder and box, including the request number to which the documents are responsive, should be provided in an accompanying index.

7.     It is not a proper basis to refuse to produce a document that any other person or entity also possesses a non-identical or identical copy of the same document.

8.     If any of the requested information is stored in machine-readable or electronic form (such as on a computer server, hard drive, CD, DVD, memory stick, or computer backup tape), you should consult with Committee staff to determine the appropriate format in which to produce the information.

9.     If compliance with the request cannot be made in full, compliance should be made to the extent possible and should include an explanation of why full compliance is not possible.

10.     In the event that a responsive document is withheld on any basis, you should provide the following information concerning the document:  (a) the reason the document is not being produced; (b) the type of document; (c) the general subject matter; (d) the date, author, and addressee; and (e) the relationship of the author and addressee to each other.

11.     If any document responsive to this request was, but no longer is, in your possession, custody, or control, you should identify the document (stating its date, author, subject and recipients) and explain the circumstances by which the document ceased to be in your possession, custody, or control.

12.     If a date or other descriptive detail set forth in this request referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, you should produce all documents which would be responsive as if the date or other descriptive detail were correct.

13.     This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date should be produced immediately upon location or discovery subsequent thereto.

14.     All documents should be bates-stamped sequentially and produced sequentially.

15.     Two sets of documents should be delivered, one set to the majority staff and one set to the minority staff.  When documents are produced to the Committee, one production set should be delivered to the majority staff in Room 2157 of the Rayburn House Office Building and one to the minority staff in Room B350A in the Rayburn House Office Building.

Definitions

1.     The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following:  memoranda, reports, expense reports, books, manuals, instructions, financial reports, working papers, records notes, letters, notices,

confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, interoffice and intra-office communications, electronic mail (e-mail), contracts, cables, notations of any type of conversation, telephone calls, meetings or other communications, bulletins, printed matter, computer printouts, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, voice mails, microfiche, microfilm, videotape, recordings and motion pictures), and electronic and mechanical records or representations of any kind (including, without limitation, tapes, cassettes, disks, computer server files, computer hard drive files, CDs, DVDs, memory sticks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2.    The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether face-to-face, in a meeting, by telephone, mail, telexes, discussions, releases, personal delivery, or otherwise.

3.    The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request? any information which might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neuter genders.

4.    The terms "person" or "persons" means natural persons, firms, partnerships, associations, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, or other legal, business or government entities, and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof.

5.    The terms "referring or relating," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with or is in any manner whatsoever pertinent to that subject.

**EXHIBIT 10**

HENRY A. WAXMAN, CALIFORNIA

CHAIRMAN

TOM DAVIS, VIRGINIA

RANKING MINORITY MEMBER

ONE HUNDRED TENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 Rayburn House Office Building

Washington, DC 20515–6143

Majority (202) 225-5051
Minority (202) 225-5074

January 30, 2007

Mr. James L. Connaughton
Chairman
Council on Environmental Quality
722 Jackson Place, N.W.
Washington, DC 20503

Dear Mr. Chairman:

We are writing to express our concern over your failure to provide the Committee with the documents we have requested in our inquiry into whether senior Administration officials edited scientific reports and took other actions to minimize the significance of global warming.

Over the past six months, we have had numerous communications with CEQ about this document request. The Committee initially requested that the documents be provided by August 11, 2006.[1] This deadline was extended to October 2, 2006,[2] and subsequently to October 23, 2006.[3] During this process, CEQ has accommodated the Committee's requests for copies of redacted documents that were previously released under the Freedom of Information Act. But with the exception of fewer than ten documents provided to the Committee yesterday evening, CEQ has refused to produce nonpublic documents to the Committee.

To date, we have made considerable concessions to CEQ to ease compliance with the Committee's request. On August 17, 2006, the Committee agreed to limit the timeframe covered

---

[1] Letter from Chairman Tom Davis and Rep. Henry A. Waxman to James Connaughton, Chairman, Council on Environmental Quality (July 20, 2006).

[2] Email from Jennifer Safavian, Chief Counsel for Oversight and Investigations, House Government Reform Committee, to Ted Boling and Ashley Cohen, Council on Environmental Quality (Aug. 29, 2006).

[3] Letter from Chairman Tom Davis and Rep. Henry A. Waxman to James Connaughton, Chairman, Council on Environmental Quality (Sept. 20, 2006).

Mr. James L. Connaughton
January 30, 2007
Page 2

by the request.[4] On August 29, 2006, the Committee agreed to limit the scope of our request to only seven CEQ staff members and officials.[5] On September 20, 2006, we further narrowed the request by eliminating two out of five criteria for documents to be produced from our original July 20, 2006, request.[6] These reductions in scope are significant and have reduced the scope of our request to the minimum necessary to fulfill our oversight responsibilities.

Most recently, the Committee requested that unredacted copies of 39 specific documents be provided by close of business last Thursday, January 25, 2007.[7] These documents were specifically identified by reference number and are easily accessible to CEQ staff. Discussions between our staffs indicate that these documents have already been pulled from their files and are ready to be delivered to the Committee.

In a letter sent yesterday evening, however, you indicated that you would produce only nine of these documents to the Committee.[8] As for the remaining thirty documents, you stated that those documents "include deliberative process materials and communications between CEQ and other agencies, between senior advisors to the President and senior CEQ officials, and information concerning the process of Presidential decisionmaking. These documents include the candid exchange of views in deliberations within the Executive Office of the President (EOP) regarding the development, bases, and articulation of policy. Therefore, releasing such documents could harm the candor and quality of deliberations within the EOP. Moreover, ten of these documents reflect foreign policy deliberations related to the development of Asia-Pacific Partnership on Clean Development and Climate, an international agreement involving the United States and multiple foreign nations, rather than CEQ edits to materials produced by other federal agencies regarding climate change." As a result of that, you offered to make the documents available again for staff review, and to bring the documents to Committee Members to review. This latest offer is still unsatisfactory to the Committee.

---

[4] Meeting between House Government Reform Committee staff and Council on Environmental Quality staff (Aug.17, 2006).

[5] Email from Jennifer Safavian, Chief Counsel for Oversight and Investigations, House Government Reform Committee, to Ted Boling and Ashley Cohen, Council on Environmental Quality (Aug. 29, 2006).

[6] Letter from Chairman Tom Davis and Rep. Henry A. Waxman to James Connaughton, Chairman, Council on Environmental Quality (Sept. 20, 2006).

[7] Letter from Chairman Henry A. Waxman and Rep. Tom Davis, Chairman, Council on Environmental Quality (Jan. 22, 2007).

[8] Letter from James Connaughton, Chairman, Council on Environmental Quality, to Chairman Henry A. Waxman and Rep. Tom Davis (Jan. 29, 2007).

Mr. James L. Connaughton
January 30, 2007
Page 3

The Committee must be able to take custody of the documents in order to make a thorough and complete review.  During this review process, we will give due consideration to the concerns you have raised.  But unless the President is prepared to assert a constitutional claim of executive privilege, the documents sought by the Committee should be provided without further delay.

As such, we request again the full production of the documents requested in the January 22, 2007, letter by February 9, 2007.

Sincerely,

Henry A. Waxman
Chairman

Tom Davis
Ranking Minority Member

**EXHIBIT 11**

# CREW | citizens for responsibility and ethics in washington

May 12, 2006

Khary Cauthen
Chief of Staff
Council on Environmental Quality
722 Jackson Place, NW
Washington, DC 20503

**Re: FOIA Request**

Dear Mr. Cauthen:

Citizens for Responsibility and Ethics in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, audiotapes, videotapes, and photographs, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, et seq.

Specifically, CREW seeks any and all records from any office of the Council on Environmental Quality ("CEQ"), including any and all field offices, dating from January 1, 2001, to the present, that mention or relate to the causes associated with the increase in the average temperature of the Earth's atmosphere and oceans that has been observed in recent decades ("climate change" or "global warming"), including, but not limited to, all records relating to scientific and policy reports. Of particular interest are any and all of the aforementioned records of or references to communications with the following persons or entities, or any employees or representatives thereof: 1) President of the United States; 2) Vice President of the United States; 3) any United States cabinet official and cabinet-level agency; 4) any other federal agency; 5) any member of Congress or member's staff; and 6) The Coal Institute, American Petroleum Institute, and/or any lobbying group, trade association, or industry group affiliated with the energy or extractive resources industry.

In addition, CREW seeks any and all CEQ records, dating from January 1, 2001, to the present, that were part of the reviewing or drafting process for all reports by the Climate Change Science Program ("CCSP"), including but not limited to Our Changing Planet and Strategic Plan for the U.S. Climate Change Science Program. Please include any and all documents submitted to and/or examined by CEQ for that report, as well as any drafts submitted to the Chief of Staff's office prior to publication.

Please search for responsive records regardless of format, medium, or physical characteristics. We seek records of any kind, including electronic records, audiotapes, videotapes, photographs, and back-up tapes. Our request includes any telephone messages, voice mail messages, daily agenda and calendars, information about scheduled meetings and/or

discussions, whether in-person or over the telephone, agendas for those meetings and/or discussions, participants included in those meetings and/or discussions, minutes of any such meetings and/or discussions, the topics discussed at those meetings and/or discussions, e-mail regarding meetings and/or discussions, e-mail or facsimiles sent as a result of those meetings and/or discussions, and transcripts and notes of any such meetings and/or discussions to the extent they relate to the CEQ's evaluation of global climate change.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 959 (D.C. Cir. 1979). Moreover, the Vaughn index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after-information." King v. United States Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" Id. at 224, citing Mead Data Central v. United States Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. See 5 U.S.C. §552(b) ("Any reasonably segregable portion of a records shall be provided to any person requesting such record after deletion of the portions which are exempt ..."); see also Schiller v. Nat'l Labor Relations Bd., 964 F.2d 1205, 1209 (D.C. Cir. 1992). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt and how the material is dispersed throughout the documents. Mead Data Central, 566 F.2d at 261. Claims of non-segregability must be made with the same degree of detail as required for claims of exemption in a Vaughn index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

## Fee Waiver Request

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii), CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. This subject is of particular interest and importance to the public in light of the revelations that CEQ officials edited conclusions made by government climate experts based on political expediency rather than sound science. 60 Minutes: Rewriting The Science (CBS

television broadcast, Mar. 19, 2006). Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. § 552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the manner and extent to which outside political forces may have affected and overridden the scientific judgments of the CCSP charged with reporting climate change data to Congress pursuant to The U.S. Global Change Research Act. 15 U.S.C. § 2921.

CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to protecting the right of citizens to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request and will likely share its analysis with the public, either through memoranda, reports, or press releases. CREW has an established record of carrying out these type of activities, as evidenced through its website, www.citizensforethics.org.

Under these circumstances, CREW satisfies fully the criteria for a fee waiver.

### Conclusion

Please respond to this request in writing within 20 days as requested under 5 U.S.C. §552(a)(6)(A)(i). If all of the requested documents are not available within that time period, CREW requests that you provide it with all requested documents or portions of documents that are available within that time period.

If you have any questions about this request or foresee problems in releasing fully the requested records within the 20-day period, please call me within that time period. I can be reached at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact me immediately upon making such a determination. Please send the requested documents to Tim Mooney, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

Tim Mooney
Senior Counsel
Citizens for Responsibility and Ethics in Washington

# EXHIBIT 12



EXECUTIVE OFFICE OF THE PRESIDENT
COUNCIL ON ENVIRONMENTAL QUALITY
WASHINGTON, D.C. 20503

November 3, 2006

Dan Roth
Senior Counsel
Citizens for Responsibility
   and Ethics in Washington
1400 Eye Street, NW, Suite 450
Washington, DC 20005

Re:    Freedom of Information Act request regarding climate change science

Dear Mr. Roth:

This is in response to the May 12, 2006 Freedom of Information Act ("FOIA") request by
Citizens for Responsibility and Ethics in Washington ("CREW") to the Council on
Environmental Quality ("CEQ").  The scope of CREW's request is as follows:

> CREW requests copies of all CEQ documents (electronic or hard copy) that refer to
> climate change science issues, including activities of the Climate Change Science
> Program (CCSP), from January 20, 2001, to October 26, 2006.  Excluded from the scope
> of this request are publicly available documents (e.g., newspaper clips that have not been
> annotated) and documents that only pertain to activities of junior CEQ staff (e.g. mail
> routing by administrative staff).
>
> CREW requests and CEQ agrees to produce a Vaughn index identifying, document-by-
> document, all documents withheld under FOIA. Given the large volume of documents
> requested, CEQ intends to begin releasing documents during the week of October 30,
> 2006, and CREW agrees to accept the production of documents and Vaughn indices on a
> rolling basis.

In our initial response letter, we noted that your request requires CEQ to evaluate several
thousand intra-governmental communications. Additionally, many of those communications
originated with other agencies and, therefore, must be referred to those agencies for review and
consultation pursuant to title 5 U.S.C. § 552(a)(6)(B) (iii)(III).  In the interest of efficiency, we
are processing our search in connection with related requests from the Committee on
Government Reform of the U.S. House of Representatives, the Natural Resources Defense
Council, and Greenpeace.

Enclosed are 188 documents, a total of 1371 pages, which CEQ is providing in response
to your pending FOIA request.  You may note that some documents provided may not be directly
responsive to your request, and we ask that you forgive any over-production of documents in the
interest of responding to overlapping document requests.  Our review of responsive documents in
ongoing.  We will provide you with additional documents, and a Vaughn index, as that review

progresses.

We thank you for your cooperation throughout this process.

Yours truly,

Edward A. Boling
Deputy General Counsel
Freedom of Information Officer

2

07 - 365
I RMU

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

Citizens for Responsibility and Ethics in Washington

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    11001
(EXCEPT IN U.S. PLAINTIFF CASES)

## DEFENDANTS

Council on Environmental Quality

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    11001
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Anne L. Weismann
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C. 20005
202-408-5565

JUDGE: Ricardo M. Urbina

DECK TYPE: FOIA/Privacy Act

DATE STAMP: 02/20/2007

CASE NUMBER 1:07CV00365

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
◉ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP
FOR PLAINTIFF

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ⊙ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) *(If pro se, select this deck)* | ☒ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act) *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Labor Railway Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities-Employment ☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☐ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
5 U.S.C. § 552 (FOIA); Council on Environmental Quality has failed to produce records requested by plaintiff pursuant to FOIA.

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   **DEMAND $**‍ _ _ _ _ _ _ _   Check YES only if demanded in complaint   **JURY DEMAND:**   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 02/20/2006   SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.